

# Fourth Court of Appeals
## San Antonio, Texas

### OPINION

No. 04-13-00333-CV

**IN THE INTEREST OF E.D.**, E.D, I.D., and J.D., Children

From the County Court at Law, Kerr County, Texas
Trial Court No. 111069C
Honorable Spencer W. Brown, Judge Presiding

Opinion by:     Sandee Bryan Marion, Justice

Sitting:         Sandee Bryan Marion, Justice
                Marialyn Barnard, Justice
                Luz Elena D. Chapa, Justice

Delivered and Filed:  November 22, 2013

REVERSED AND RENDERED

This is an appeal from the trial court's termination of appellant's parental rights to his four children.[1]  TEX. FAM. CODE ANN. § 161.001(1)(D),(E),(F),(O), (2) (West Supp. 2013).  On appeal, appellant challenges the legal and factual sufficiency of the evidence in support of the trial court's findings.  We reverse and render.

### STANDARD OF REVIEW

A trial court may order termination of the parent-child relationship only if the court finds by clear and convincing evidence one or more statutory grounds for termination and that

---

[1] Appellant will be referred to as "appellant," his wife as "Tina," and the children as ED(1), ED(2), ID, and JD. ED(1) was born November 16, 2001; ED(2) was born February 24, 2003; ID was born November 24, 2006; and JD was born September 16, 2008.  Tina voluntarily relinquished her parental rights under a prior interlocutory order that became final upon the signing of the final judgment in this appeal.

termination is in the child's best interest. *Id.* § 161.001(1), (2). Here, the trial court terminated appellant's parental rights based on its findings that termination was in the children's best interest and that appellant had:

> knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children;

> engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children;

> failed to support the children in accordance with the father's ability during a period of one year ending within six months of the date of the filing of the petition;[2] and

> failed to comply with the provisions of a court order that specifically established the actions necessary for the father to obtain the return of the children who have been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the children's removal from the father under Chapter 262 for the abuse or neglect of the child.

Because we conclude the evidence is legally insufficient to support the trial court's best interest finding, we focus our review of the evidence as it pertains to that finding. When reviewing the legal sufficiency of the evidence in a case involving termination of parental rights, we determine whether the evidence is such that a factfinder could reasonably form a belief or conviction that there existed grounds for termination under section 161.001(1) and that termination was in the child's best interest. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). In doing so, we examine all the evidence in the light most favorable to the finding, assuming that the "factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id.* We must also disregard all evidence that the factfinder could have reasonably believed to be incredible. *Id.* However, we must not disregard all the evidence that does not support the finding, as doing so could "skew the analysis of whether there is clear and convincing evidence." *Id.*

---

[2] On appeal, the State concedes there is no evidence to support this ground for termination.

**BEST INTEREST**

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). In determining whether termination of parental rights is in a child's best interest, courts may apply the non-exhaustive *Holley* factors to shape their analysis. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These include, but are not limited to, (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *Id.*

**A.      Direct Evidence of Best Interest**

The only direct evidence of best interest came from Shannon Walker, a Child Protective Services supervisor, and Christi Stearns, a licensed professional counselor who testified about her counseling of all four children for the past nine months. When Walker was asked why termination would be in the children's best interest, she responded it would be in their best interest if they were adopted. She explained that if both parents' parental rights were terminated, the children's maternal grandparents could get financial assistance after adopting the children. She said that if the parental rights were not terminated, the grandparents would not be entitled to a financial subsidy. She also said adoption by the grandparents would give the children a sense of permanency, as opposed to merely allowing the grandparents to act as conservators. When Stearns was asked what would be in the children's best interest, she responded they needed to be in a

stable, loving environment where they have established rules and guidelines for their home and where they will not be moved from place to place.

The only evidence about the children's desires was Stearns's testimony and Tina's testimony. Stearns testified ID "wonders quite a bit about why she's not with her parents," ED(2) has mentioned returning to her grandparents if she cannot return to her mother, and ED(1) has a hard time understanding that she is in foster care and being around her peers. Stearns said she believed the children looked forward to their visits with their mother and father. Stearns stated she would ask the children generally about their visits with their parents, but she never directly asked ID about her relationship with her father, and she did not know how the children were doing emotionally or physically when they were with their parents. Tina testified that during visitation with the children, they asked when they could come home with her.

On the factor regarding the future emotional and physical needs of the children, both Walker and Stearns said the children needed a stable home life. This testimony is based on the fact that the family moved several times before the children were removed in 2011 and because, according to Walker, in the almost nineteen months the children have been in foster care the Department has not been able to see a home appellant lived in that had beds for the children, food for the children, or anything else the children would need to be well cared for.

The specific testimony regarding the family's various moves came from Tina. She testified the family moved from Amarillo to Rio Hondo for about eighteen months, then back to Amarillo for two years, and then finally to Kerrville in 2009. They lived in a house in Kerrville for about eighteen months before moving to property in nearby Hunt. Tina said that whenever appellant accepted a new job, the family moved with him so that they would not be apart. To accomplish a family move, ED(1) was home-schooled during her first grade and part of her second grade school years.

The State put on no evidence about the grandparents' parental abilities or the grandparents' plans for the children. *Holley*, 544 S.W.2d 367, 371–72. As to the factor regarding the stability of the grandparents' home, Walker testified about various concerns raised during a recent home study involving the physical condition of the grandparents' house, but Walker believed they "could potentially remedy all of the concerns." However, to do so, the grandparents would need the financial assistance they could receive if they adopted the children after the parents' parental rights were terminated. We note that although Walker testified about the grandparents adopting the children, in its termination order, the trial court specifically found that "appointment of the Respondent Grandparents as permanent or joint managing conservators of the children is not in the children's best interest." Instead, the court appointed the Department as permanent managing conservator.

On the other hand, and although we acknowledge the trial court is the sole judge of a witness's credibility, we may not disregard evidence that does not support the trial court's best interest finding. Appellant testified he has renewed his license to practice medicine and he now has a job in Laredo, Texas, with another doctor. He and Tina rent an apartment about four minutes from the hospital. He said the apartment has a gate, a daycare is located two blocks away, and a school for the older girls is about eight blocks away. He said he now has the financial means to buy bedding and whatever else is necessary to accommodate the children. He has also made a tentative speech therapy appointment for JD in May. He has complied with his plan by attending counseling and getting a parenting certificate.

Appellant said he is committed to the safety, welfare, and general well-being of his children. He believed it would be in the children's best interest to complete the school year where they are currently living in Austin in foster care, and then gradually come home to Laredo. He countered Walker's testimony that the children had to be held back in school when they were first

taken into care by the Department. He explained the girls had been home-schooled but when they were taken, the Department could not account for home-schooling and did not test the children or try to place them in an appropriate grade level, instead, the Department held ED(1) and ED(2) back one to two years. He said when the children lived with him the girls did excellent work at school and ED(1) was on the honor roll and placed in special advanced classes for gifted children. He said ED(2) did very well academically and ID was in daycare. JD had been potty-trained before his removal, but once with the Department, he was no longer potty-trained. Appellant described his children as talented, gifted, cooperative, and good.

We do not believe terminating a parent's rights to his children so that someone can obtain financial subsidies upon adoption is an appropriate basis on which to base a best interest finding. However, in addition to direct testimony on the best interest prong, evidence that proves one or more statutory grounds for termination may also constitute evidence illustrating that termination is in the child's best interest. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002) (holding same evidence may be probative of both section 161.001(1) grounds and best interest, but such evidence does not relieve the State of its burden to prove best interest). A best-interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence. *In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.). A trier of fact may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest. *Id.* Therefore, we next consider the State's argument that appellant's pattern of behavior supports a finding that terminating his parental rights is in the children's best interest. In support of this argument, the State points to five incidents that occurred over a period of eight years.

**B.        Pattern of Behavior**

The first incident relied upon by the State occurred in 2003 when ED(2) was born with drug "withdrawal" symptoms.  However, blood tests on both Tina and ED(2) showed no drugs present in their system.  The next incident occurred in 2005, when ED(1) and ED(2) were found unsupervised in a hotel elevator in Odessa, Texas, while appellant and Tina were in the lounge area eating breakfast.  According to Walker, one of the girls got caught in the elevator doors and had a black eye, which led to a call to the Department.  Tina testified the black eye was the result of a fall from monkey bars while ED(2) was in daycare.  Tina asked the daycare to fax the incident report to the Department and "it was dropped."

The third incident occurred in May 2009, when ID was discovered in a hotel parking lot in Kerrville, Texas.  Zach Martin of the Kerrville Police Department testified that, at about mid-day on May 21, 2009, he responded to a call at Inn of the Hills on Junction Highway because ID, who was three or four years old at the time, was found "roaming in the parking lot."  Martin explained that appellant had left JD, who was then an infant, sleeping in his crib while he escorted the other three children to the hotel lobby to eat breakfast.  But, appellant did not stay in the hotel lobby with them; instead, he went to a computer room in the balcony area and let the three children go to the dining area, apparently on their own.  ID was later found in the parking lot on the same side of the hotel as her room.  JD was found in the hotel room by himself in his crib.

Martin testified appellant explained that he left his son, JD, asleep in the crib and he would check "back and forth," but he never gave Martin an estimate of how often he checked on JD. Martin said he thought appellant had recently gotten a job with the hospital and he had been living in the hotel for a couple of weeks because his residence was "in limbo."  Martin called the Department and an investigator took over.

About three months later, also in 2009, appellant left the two older children, ED(1) and ED(2), outside the gate to Sea World in San Antonio while he took the two younger children with him to park the car. When appellant and the younger children arrived at the gate, the police were there with the two older children. The children were subsequently taken to the emergency room because one of the girls had a rash and JD had a respiratory infection. None of the children were admitted to the hospital. For the first time, the Department opened a case.

On Friday, November 2, 2011, JD was found alone in appellant's locked medical offices. By this time, Tina had been arrested in October 2011 and appellant was caring for the children on his own.[3] The responding officer, Stephen Wherry of the Kerrville Police Department, testified he was dispatched to appellant's office building. He found JD, who was about three years old at the time, sitting inside the building next to a glass door. JD was wearing shorts, a t-shirt, and one sock. Wherry knocked on the door several times, but no one answered. Eventually, appellant drove up to the building, entered from another side of the building, picked up JD, and unlocked the door for Wherry. Appellant admitted he had left to pick up his other children from school. He said he had been gone for only about five minutes, although Wherry said he had been at the scene for about twenty minutes before appellant arrived. Wherry said the other children were in the vehicle. Wherry also contacted the Department.

On Monday, November 7, 2011, appellant met with a Department investigator and agreed the children might be better off with their maternal grandparents because he was having difficulty caring for four children and operating two medical clinics while Tina was incarcerated. Appellant agreed to enroll the children in school in Abilene, Texas where the grandparents lived.

---

[3] Tina served fourteen months for prescription fraud. Also associated with the prescription fraud charge was a false identity charge. Tina was released from incarceration on December 17, 2012.

According to appellant, when he and the children arrived in Abilene on November 8, he took ED(1) and ED(2) directly to their new school and then went to the grandparents' house with the two younger children. However, sometime on the morning of November 8, the investigator spoke with the grandmother who said all four children were with her in Abilene. Later that same morning, an Abilene Police Department officer went to the grandparents' home and discovered the children were not in the home. The grandmother told the officer the children and appellant would return that evening. By 11:15 a.m. on November 8, the case was "staffed" for emergency removal. At about noon, the Department caseworkers took the two oldest children out of school and removed the other children from their grandparents' house. Appellant said he was shocked because he assumed everything was in order after he had spoken to the Department investigator. Appellant said the call to the grandparents prompted a police visit, which prompted an emergency hearing, which then prompted an emergency removal because the children were perceived to be in grave danger. By 3:24 p.m. on November 8, the State had filed its "Original Petition for Protection of a Child, For Conservatorship, And for Termination in Suit Affecting the Parent-Child Relationship."[4]

Finally, Walker testified that during one of appellant's post-removal visitations with his children at a McDonald's Restaurant, appellant walked out into the parking lot and failed to notice that JD was behind him. According to Walker, the caseworker and foster parent had to intervene to prevent JD from being hit by a vehicle. She said appellant and his wife Tina are still together, although Tina voluntarily relinquished her parental rights hoping the children could remain with her parents.

---

[4] Later in November 2011, appellant was arrested on prescription fraud charges and he spent approximately four or five months incarcerated.

Even if we were to assume these incidents provide a basis for the trial court's findings on the section 161.001(1) grounds for termination, we do not believe these isolated incidents spanning a period of eight years support a finding of best interest. *See In re C.H.*, 89 S.W.3d at 28.

## CONCLUSION

As noted above, we do not believe terminating a parent's rights to his children in order to allow another person to obtain financial assistance upon adoption supports a best interest finding. Even when viewing all the evidence in the light most favorable to the trial court's best interest finding, we do not disregard evidence that does not support the finding, as doing so could "skew the analysis of whether there is clear and convincing evidence." *In re J.F.C.*, 96 S.W.3d at 266. On this record, we do not believe the State met its burden to establish by clear and convincing evidence that the incidents outlined above support a finding that termination of appellant's parental rights is in the children's best interest. Therefore, we must conclude the evidence is legally insufficient to support the trial court's best interest finding.

Accordingly, we reverse that portion of the trial court's order terminating appellant's parental rights and render judgment that the Department of Family and Protective Services' petition requesting termination of his rights is denied. *See id.* (holding rendition of judgment in favor of parent generally required if there is legally insufficient evidence).

Sandee Bryan Marion, Justice