

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-14-00920-CV

**IN THE INTEREST OF D.R.F.**, a Child

From the 131st Judicial District Court, Bexar County, Texas
Trial Court No. 2013-PA-01502
Honorable Cathleen M. Stryker, Judge Presiding

Opinion by:    Sandee Bryan Marion, Chief Justice

Sitting:    Sandee Bryan Marion, Chief Justice
Rebeca C. Martinez, Justice
Luz Elena D. Chapa, Justice

Delivered and Filed:  April 15, 2015

AFFIRMED

This is an accelerated appeal from the trial court's order terminating appellant's parental rights to her six-year-old son, D.F.R.  On appeal, appellant asserts the evidence is insufficient to support the trial court's findings that she failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain return of D.F.R., and that termination is in D.F.R.'s best interest.  We affirm.

### STANDARD OF REVIEW

A court may terminate parental rights only upon proof of clear and convincing evidence that the parent has committed an act prohibited by section 161.001(1) of the Texas Family Code, and that termination is in the best interest of the child.  TEX. FAMILY CODE ANN. § 161.001(1), (2) (West 2014).  Clear and convincing evidence is "proof that will produce in the mind of the trier of

fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007.

When conducting a legal sufficiency review in a parental rights termination case, we consider "all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We give deference to the fact finder's conclusions and presume the fact finder resolved any disputed facts in favor of its finding, so long as a reasonable fact finder could do so. *Id.* We disregard any evidence that a reasonable fact finder could have disbelieved, or found to have been incredible, but we do not disregard undisputed facts. *Id.* Credibility issues are generally determined by the fact finder and we are not permitted to weigh credibility issues that depend on the appearance and demeanor of witnesses. *Id.* at 573-74.

When conducting a factual sufficiency review in a parental rights termination case, we give due deference to the fact finder's findings and must refrain from substituting our judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.F.C.*, 96 S.W.3d at 266.

## FAMILY SERVICE PLAN

Appellant's parental rights were terminated on the grounds that she failed to comply with the provisions of a court order (the Family Service Plan) that specifically established the actions necessary for her to obtain the return of D.F.R. who had been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services (the

"Department") for not less than nine months as a result of the child's removal from appellant. *See* TEX. FAM. CODE § 161.001(1)(O).

## A. The Family Service Plan

Following an August 20, 2013 status hearing at which appellant was present, the trial court entered findings that (1) appellant had reviewed and understood her service plan, and (2) had been advised that "unless she is willing and able to provide the child with a safe environment, even with the assistance of a service plan, within the reasonable period of time specified in the plan, her parental and custodial duties and rights may be subject to restriction or termination or the child may not be returned to her." The plan set forth several goals, including demonstrating the ability to (1) parent and protect D.R.F.; (2) provide basic necessities such as food, clothing, shelter, and medical care; (3) use appropriate family and friends to obtain necessary support; and (4) protect the child from harm.

The plan also set forth several tasks and services, including (1) completing anger management classes and parenting classes, a psychosocial assessment, and a drug assessment; (2) attend Narcotics Anonymous ("NA") or Alcoholics Anonymous ("AA") meetings; (3) demonstrate she is financially able to provide for D.R.F. and "find a steady job by providing current paystubs showing the total hours she has worked"; (4) maintain full contact with her caseworker by providing up-to-date telephone numbers and addresses; (5) cooperate with the Department and all service providers and follow all their recommendations; and (6) participate in individual counseling sessions.

## B. The Evidence

Appellant was the first witness to testify on the first day of trial, which commenced on October 20, 2014. At the time of trial, she was thirty-two years old and living in a two-bedroom apartment with one of her sisters. She moved in with her sister about two weeks before the

termination hearing, and did not know its address or complete name. For the year before moving in with her sister, appellant lived at Haven for Hope. At that time, she was on a list to obtain her own apartment, but she later discovered that because she had broken three leases in the past, it would be difficult for her to get her own apartment. Appellant is not listed on her sister's lease as an authorized occupant. She said she had not yet informed her caseworker that she is living with her sister.

Appellant testified she worked the night shift at McDonald's, where her hours vary every two weeks. She does not have a car, and takes the bus for her one-hour commute to work. She said if her son was returned to her, she has babysitters and her mother to look after the child while she worked.[1] She also said she has considered three different places to place D.R.F. after school, one of which is a State-funded program that helps with day care.

Appellant testified she has completed her psychological evaluation and parenting and anger management classes; she has completion certificates; and she has not stopped her counseling. She said she has "changed [her] ways in every possibility [sic]," and she has learned to interact with D.F.R. without using physical discipline. Appellant said she attends counseling twice a week. She has complied with requests for drug tests, all of which were negative. Appellant said she is re-learning how to be with D.R.F. and is practicing her parenting skills. For example, she is learning to be patient and to not lose her temper. However, appellant admitted the Department caseworker asked her to "redo" all her services. Appellant said she has not re-taken an anger management class because she is waiting on the paperwork, and she was not aware she was required to attend NA and AA meetings. She admitted to one incident in the past where she told her therapist that

---

[1] D.R.F. has been in placement with appellant's parents since late August 2013.

"no one was going to tell [her] how to raise [her] son," but, she said that has changed because she now knows what her therapist wants for her son.

Appellant acknowledged she was allowed to have supervised visits with her son at her mother's house. According to appellant, her mother only allows her to see D.R.F. when it is "convenient" for her mother. She also acknowledged she could have visited her son at "Kidshare," but she cannot afford to pay the $10 per hour fee to do so. She said she probably saw her son twenty-five percent of the time she was allowed to see him, and does not see him more often because "I'm working. I do have a life. I do have another kid." Appellant also admitted she is not allowed to see her other child, allegedly because she does not have a suitable place to take her for visits. Appellant asked the court to allow D.R.F. to stay in his current placement with his grandparents until he finished school for the current year, and that she be able to pick him up whenever she wanted.

Appellant provides $327 per month in child support for her other child, which money comes from her social security payments. She said she pays child support for D.R.F. but she was unable to state the amount because she does not actually pay any money; instead, she buys him things. The last time she bought anything for D.R.F. was in July before school started.[2]

At the end of the first day, the trial court ordered the parties to mediation. However, appellant failed to attend, and no agreement was reached.

About two months later, on the last day of trial, appellant was recalled to the stand and again asked about her living accommodations:

Q. And do you have the address now?
A. Uh, I don't know why y'all need the address. My son is not coming home to me anyways.
Q. Okay. Are you not asking the Court to send your son home?

---

[2] The date of the termination hearing was October 20, 2014.

A. I mean, I've done everything possible, and I've completed all my classes for that (crying), but y'all don't see anything that I have done, so why should I even give y'all my address.

Q. Okay. So, why wouldn't you want to give the Court your address if you have a stable place for your son?

A. Because I don't see how that's going to help the case.

Q. Okay. Now, if the Department had information that you're not residing there [with her sister], what would be your response to that?

A. That would be — that's where — where I'm staying at, and my mom knows where I'm staying at, and she should be the only person that should know.

. . .

Q. And did you hear about how [the therapist] believes it's in the best interest of your child that he have a stable home environment? Did you hear that?

A. Yes, ma'am.

Q. Okay. And if you're unwilling to provide the Court with an address, how can you assure her that this is a stable home environment?

A. Because I am asking the Court to let him come home with me every holiday, and for [the State] to supervise that.

. . .

Q. Okay. Now, do you understand that this case has been ongoing for quite some time?

A. Yes, I do.

Q. And that, in general, you have one year to complete everything?

A. Yes, I do. But I'm not going to sit there and sign custody over to my mom when I don't believe that (crying) y'all are — y'all haven't even given me a chance to show you all the things that I've learned since I completed my classes.

Appellant was then asked why she had not appeared at a court-ordered mediation that followed the first day of trial, and appellant responded:

A. I'm tired. I'm tired. This case has been going on for a long time.

Q. Okay. Why didn't you go to mediation?

A. Because I'm tired. . . . I don't get to sleep like y'all do.

Q. Okay. So, you didn't go to mediation because you were tired, is that — I'm just trying to — the court ordered you to go, so we can come up with a resolution hopefully?

A. A resolution how? What resolution are y'all asking for? You're killing me? What is it that you want? I mean, I've been patient.

When asked why she was not seeing her son as often as she was permitted, appellant responded, "Because he's not the only person that I have to worry about"; appellant said she also

has to worry about her daughter. Appellant stated she had quit her job at McDonald's because she was being harassed, and she had not yet found another job.

Next, Michelle Moran, a psychologist, testified she completed a psychological evaluation of D.R.F. in July, and she has also met with appellant. Moran said appellant's intellectual capacity fell below average, but not within the range of impairment. Moran believed appellant had the intellectual ability to understand her service plan, perform or attend the services on the plan, and learn from the services. Moran recommended appellant engage in both individual and family counseling with her son for the purpose of learning new parenting techniques. She said appellant admitted she sometimes lacked patience with D.R.F. and admitted using inappropriate discipline. Moran believed appellant had the capacity to change her behavior through counseling.

Melanie Hennis, D.R.F.'s therapist, testified the child initially had impulse control problems, lacked self-regulating skills, and was inattentive. However, Hennis said that, over the year she has seen him, D.R.F. has made "huge progress," and he is doing well in school. Hennis said she also had family sessions with appellant and D.R.F., with the goal of teaching appellant how to interact with her son in a non-physical manner. She explained that D.R.F. was impulsive, "pretty active and pretty hyper," and a "high maintenance kiddo" who "could be difficult to parent." According to Hennis, D.R.F. needs structure, routine, lots of activities and stimulation, and someone to advocate for him at school. Therefore, she thought appellant needed to learn how to calmly parent him, and she agreed appellant was not providing her son with the needed structure. Hennis said appellant showed some resistance to parenting suggestions when counseling first began, but appellant was able to redirect herself. Hennis said appellant also followed her suggestion to use non-physical means to redirect D.R.F.'s behavior.

When asked for her recommendation on the child's placement, Hennis responded he is doing well with his grandparents and is in a stable and supportive environment. As to appellant,

Hennis said she would recommend more counseling, and she did not believe appellant was in a position to take D.R.F. out of his current placement. She did not believe it would be in D.R.F.'s best interest to be in a situation with unstable housing because he needed stability and consistency. She thought D.R.F. should stay permanently with his grandparents. She had no opinion on whether appellant's parental rights should be terminated.

The Department caseworker, Brittany Shaffer, testified she has spoken to appellant over the telephone, but has not been able to meet with her personally because appellant missed appointments. Shaffer told appellant she needed to retake parenting and anger management classes, but appellant did not believe she needed to retake the classes. Shaffer said the Department believed appellant needed to retake the classes because she was unable to display what she had learned during the family therapy sessions. Shaffer said that after speaking to appellant's therapist, the Department decided appellant would benefit from retaking the anger management class.

Shaffer testified appellant has had three therapists, the first two discharged appellant because she missed appointments. Appellant started with her third therapist in July, continued through October, but then quit because she does not believe her son will be coming home to her. Shaffer said appellant also has missed family therapy appointments with her son. Shaffer said that in the eighteen months the case has been pending, appellant has had ample time to comply with her service plan and to meet her goals, but she has not done either.

Shaffer said she has not been able to verify new employment or where appellant is currently residing. She believed termination was in the child's best interest because he was currently in a stable, safe, and protective home environment.

Finally, appellant's mother, Marbea, testified. Marbea said appellant told her she was living with her sister, but Marbea has not been able to verify this and does not know the address. Marbea knew appellant was taking classes, but she did not believe appellant was applying what

she learned. Marbea said appellant could see D.R.F. whenever she wanted as long as she gave twenty-four-hour advance notice. But, Marbea said appellant actually wanted to take D.R.F. by herself whenever she wanted, and Marbea would not allow that. She believed termination was in D.R.F.'s best interest because he now has the routine and structure he did not have before coming to live in her home.

## C.      Application

"Parents frequently fall short of strict compliance with a family-service plan's requirements." *In re S.M.R.*, 434 S.W.3d 576, 584 (Tex. 2014). "But whether a parent has done enough under the family-service plan to defeat termination under subpart (O) is ordinarily a fact question." *Id.* In this case, the trial court heard evidence that appellant had completed several of the plan requirements. However, the court also heard evidence that the Department and service providers believed appellant needed to retake some of her classes and attend additional counseling, but she refused. Several witnesses testified appellant had not learned from her classes or was not applying what she had learned. Appellant also refused to provide the court with her current address, and she is unemployed. She has not attended any NA or AA meetings.

In addition to not completing all of her tasks and services, it is apparent appellant has not met her goals of demonstrating the ability to (1) parent and protect D.R.F.; (2) provide basic necessities such as food, clothing, shelter, and medical care; (3) use appropriate family and friends to obtain necessary support; and (4) protect the child from harm. We therefore conclude the evidence is legally and factually sufficient to support the trial court's finding that appellant failed to comply with the requirements of her service plan. *See* TEX. FAM. CODE § 161.001(1)(O).

## BEST INTEREST

A trial court may order termination of the parent-child relationship only if the court finds by clear and convincing evidence one or more statutory grounds for termination and that

termination is in the child's best interest. TEX. FAM. CODE § 161.001(1), (2); § 161.206(a). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007. There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). However, when the court considers factors related to the best interest of the child, "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE § 263.307(a). In determining whether a child's parent is willing and able to provide the child with a safe environment, the court should consider: (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department or other agency; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. *Id.* § 263.307(b).

Courts also may apply the non-exhaustive *Holley* factors to shape their analysis. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). These include, but are not limited to, (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *Id.*

Finally, evidence that proves one or more statutory grounds for termination may constitute evidence illustrating that termination is in the child's best interest. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002) (holding same evidence may be probative of both section 161.001(1) grounds and best interest, but such evidence does not relieve the State of its burden to prove best interest). A best-interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). A trier of fact may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest. *Id.*

We believe the above evidence supports a finding of appellant's unwillingness and inability "to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision." *See* TEX. FAM. CODE § 263.307(b)(1).

In addition to the above evidence, the trial court also heard testimony that appellant spent time with an individual named "Ray." Although she said she has known him for three years, she did not know his last name. Although she said she no longer speaks to him and broke up with him about a month before the termination trial began and he was not someone she would "bring around

- 11 -

her kids," she said he recently drove her to a restaurant where she met her mother and D.R.F. She had previously testified she took the bus to this restaurant. Appellant admitted she asked her mother to not tell anyone appellant was with Ray, and that she told her mother Ray would not "pass a background check." Appellant agreed Ray was not an "appropriate person" to have around D.R.F.

Additionally, we note the Department filed its original petition on June 20, 2013, and the trial court rendered a temporary order appointing the Department as temporary managing conservator on that same date. After an extension of time, the trial court was required to dismiss the case by December 22, 2014. *See* TEX. FAM. CODE § 263.401(a), (b). The final day of the termination trial was held on December 22, 2014. Therefore, appellant had eighteen months in which to fully comply with her service plan and demonstrate a "willingness and ability . . . to effect positive environmental and personal changes within a reasonable period of time." *See* TEX. FAM. CODE § 263.307(11). The evidence supports a finding that she did not do so.

Finally, under the *Holley* factors, appellant refused to verify her address, did not have a job, and she had failed to demonstrate the ability to meet the present and future emotional and physical needs of D.R.F. Appellant's parenting ability stands in sharp contrast to her mother's ability to care for D.R.F. Both of appellant's parents have been certified through the "Fostering Connections Program"; their home meets the standards set by that program; and Marbea attended almost twenty sessions with the family therapist and these sessions have been decreased from every two weeks to once a month because of the improvement in D.R.F.'s behavior. Marbea and her husband have established a structure and routine for the child, which he lacked when he first came into their care. This evidence supports a finding that appellant's parents are willing and able to meet D.R.F.'s present and future emotional and physical needs, they take advantage of the

programs available to assist them to promote D.R.F.'s best interest, and their home is stable. *Holley*, 544 S.W.2d at 371-72.

We conclude the evidence is legally and factually sufficient to support the trial court's best interest finding.

## CONCLUSION

We conclude the evidence is legally and factually sufficient to support the trial court's findings. Therefore, we overrule appellant's issues on appeal and affirm the trial court's Order of Termination.

Sandee Bryan Marion, Chief Justice