

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-16-00486-CV

**IN THE INTEREST OF J.C.H.** and J.D.H., Children

From the 407th Judicial District Court, Bexar County, Texas
Trial Court No. 2015-PA-00331
Honorable Richard Garcia, Judge Presiding

Opinion by:    Sandee Bryan Marion, Chief Justice

Sitting:    Sandee Bryan Marion, Chief Justice
Marialyn Barnard, Justice
Rebeca C. Martinez, Justice

Delivered and Filed: November 23, 2016

AFFIRMED

This is an accelerated appeal from the trial court's order terminating appellant's parental rights to her two daughters, J.C.H. and J.D.H.[1]   In a single issue, appellant challenges the sufficiency of the evidence in support of the trial court's finding that termination of her parental rights was in the children's best interest.  *See* TEX. FAM. CODE ANN. § 161.001(2) (West 2014). We affirm.

### BACKGROUND

Appellant appeared at the termination hearing with her attorney, and she testified. Appellant said the children's father ("Julius") had been murdered in February 2016.  Appellant

---

[1] The children were born on March 5, 2013 and February 14, 2014, respectively.  At the time of the termination hearing the girls were two and three years old, respectively.

acknowledged the Texas Department of Family and Protective Services (the "Department") had initiated family-based services in November 2014, which continued until February 2015. Appellant's two children were taken into care by the Department on March 4, 2015.[2] Appellant admitted she did not complete the services required of her during that time. She denied a March 2015 car accident in which she and Julius crashed into each other's car, and she denied the youngest child was in the car with her at the time. When asked if there was domestic violence in her relationship with Julius, appellant responded "[t]here were arguments." She denied any physical violence or that Julius had once broken into her house. Appellant admitted she did not complete her individual counseling, but said she completed her parenting classes and gave a certificate of completion to her Department caseworker, who declined to accept the certificate. Appellant said she was then scheduled to attend parenting classes from another provider. Appellant also said she completed her domestic violence classes. Appellant testified she only missed one drug test—while she was in Chicago for Julius's funeral—but she admitted she tested positive for drugs once (marijuana). Appellant was in Chicago from about February 23rd or 25th until March 5th or 6th, 2016. Appellant said she was "unsuccessfully discharged" from the anger management classes and from counseling because she went to Julius's funeral. Appellant said that when she returned from Chicago, her caseworker did nothing to help her re-engage in any services.

Appellant testified that since the birth of her children she had been their primary caretaker, and she believed she was "very bonded" with her children and her children knew her even though she had not seen them since February 2016. When appellant returned from Chicago in early March, she asked her caseworker if she could see the children, but was told not until after she submitted to a random drug test. Appellant said she waited to be called to take the drug test, but

---

[2] The termination hearing commenced on July 8, 2016.

her caseworker never called her. Finally, in April 2016, appellant took a drug test, which showed her positive for drugs.

When asked why she had not seen her children in almost five months, appellant blamed her caseworker, alleging the caseworker was not doing her job because she was not supervising the visits. According to appellant, the caseworker made her choose between going to work and seeing her children, and when appellant said she wanted to go to work to provide for her children, the caseworker told appellant her priorities were wrong.

Appellant said she had been living in a two-bedroom townhouse for about fifteen months, and she had held a full-time job for the past ninety days, earning $9.50 per hour. Appellant testified she had family and friends who would help her with the children and financially. When asked if she had a plan in place if the children were returned to her, appellant said she would continue working, she had already selected daycare centers, she had people to help watch the children outside the daycare hours, she knew the location of the children's doctors, and she believed she was capable of caring for the children. She understood the Department's concerns regarding domestic violence and her anger issues, but she believed she had worked through her issues and learned from her classes.

Appellant said she had a male "friend" who was one of the people she could turn to for support. But, when asked why she did not want to listen to her caseworker about the man's extensive criminal history, appellant replied, "[t]hat wasn't somebody I planned to marry." She said her "friend" told her himself about his criminal history, and she believed people could change. Appellant admitted she communicated with Julius before his death, despite her caseworker's misgivings about him, because appellant wanted him to be in their children's lives.

The next witness was the Department caseworker, Cecilia Herrera. Herrera testified an initial referral came into the Department based on "environmental concerns" because there were

dirty diapers, old food, rotting food on the floor, and a lack of cleanliness in appellant's house. The next referral was based on allegations of medical neglect and physical abuse to J.D.H. Herrera explained J.D.H. had been taken to an emergency room where she was diagnosed with pneumonia and it was determined she had "not been appropriately treated by her parents or caregivers." A third referral again involved allegations of abuse to J.D.H., this time "due to both parents engaging in a domestic dispute, where both of them crashed into each other's vehicle with [J.D.H.] in [appellant's] car." According to Herrera, appellant explained the incident happened at a gas station when Julius started chasing her in his car and he crashed into her car. Herrera said there were also concerns about Julius's drug use and allegations of several incidents of domestic abuse between him and appellant. Herrera stated the Department was also concerned about appellant's mental health because she had threatened to take her own life and the children's lives. Herrera said appellant explained her thoughts of suicide were an isolated event related to her discovery that Julius had cheated with another woman.

After completing a family assessment with appellant, the Department believed the best interests of the family was served by appellant completing classes for parenting and domestic violence, engaging in counseling, submitting to random drug screens, staying in contact with the Department, and maintaining a safe and stable environment for the children. Appellant completed her psychological evaluation and her domestic violence class, but she did not complete her parenting class. Herrera said she provided appellant with a list of resources for parenting classes in her community, but appellant did not want to use these resources and, instead, found one on her own that was acceptable to the Department. However, she did not complete the course.

Herrera testified that in late Summer or early Fall of 2015, the Department provided a family reunification plan to appellant that required her to fully engage in counseling, complete a parenting class, and complete her domestic violence class. Herrera explained the reunification

plan also required appellant to prepare her house for the children so that when they came to the house, the children had a play area. However, Herrera said during an August visit with the children at appellant's house, appellant was not prepared, the house was not "child-friendly," appellant was unable to parent the children or redirect them and she "lost control" by raising her voice, and pulling a backpack off J.D.H.'s back, which resulted in a tantrum by J.D.H. This, in turn, caused appellant to lose her temper. Herrera said J.D.H. was crying and wanted to leave.

Prior to this date, visits took place at the Department offices. Herrera said visits at the Department offices also sometimes ended in the same manner, with the children wanting to leave and appellant

> initially, was extremely angry and lost her temper, but when one of the caregivers arrived and walked in she — that's when — and she saw how the child immediately — [the child's] demeanor changed and calmed down and went straight for [the caregiver] [who] held [the child] and hugged her and [the caregiver] was able to comfort [the child] in a way that the [appellant] couldn't, that shattered [appellant's] heart and that just broke her down.

However, according to Herrera, appellant did nothing to remedy the situation during the pendency of the case. Herrera did not believe appellant accepted responsibility for what brought her children into the Department's care because appellant always blamed someone else.

After the August visit with the children, Herrera recommended parenting classes with another provider, called iParent. Herrera said the iParent classes initially went very well, and appellant's visits with her children were "appropriate" when the iParent instructor was present during the visit. Appellant attended the classes from September 2015 to February 2016, and then stopped. Herrera said she initially set up the appointments with iParent, but told appellant she needed to set the appointments herself beginning in December 2015, at which point appellant failed to follow through. Prior to entirely ending the iParent program in February 2016, appellant missed twenty-nine visits with her children. Herrera said appellant missed two months of visits because,

according to appellant, she was working and could not accommodate the schedule. Between June 2015 and February 2016, appellant missed at least one or two visits every month. When appellant attended a visit, she was often fifteen to thirty minutes late for the one-hour visit. When offered the opportunity for two-hour visits, appellant declined because she grew frustrated. Herrera said that each time appellant asked to change the visitation schedule to accommodate her work schedule, the Department acquiesced unless the request was for a last minute change.

Herrera said appellant was unsuccessfully discharged from counseling with one provider in June and September 2015, and then unsuccessfully discharged from counseling with another provider in April 2016. The discharges were due to "noncompliance" and "nonengagement." One of the providers recommended anger management classes, which appellant started but she was unsuccessfully discharged from in February 2016.

Herrera said appellant changed her telephone number multiple times, and Herrera had difficulty maintaining consistent communication with appellant, especially when trying to have appellant submit to a random drug test. She said appellant refused to submit to many of the tests. Herrera stated appellant was required to take monthly drug tests, but she refused or failed to submit to eight tests. During a May 12, 2015, court hearing, appellant was ordered to take a test, but she left without submitting. She tested positive following a test in April, although she denied using any drugs.

Herrera said that on a Saturday evening in November 2015, at around 6:43 p.m., appellant and Julius called Herrera while the couple was at a birthday party. Herrera said the children were not, at this time, placed with the maternal family, but the Department had allowed the maternal aunt and grandmother to have the children for the day. Herrera said the children

> were there at a birthday party, [the parents] were not aware the children were going to be at this specific birthday party and that the maternal family was trying to fight with them and take the children without — without them wanting the kids to leave

and [the parents] wanted [Herrera's] permission to keep the kids there and have [Julius's] sister supervise the contact.

. . .

[The parents] both reported [to Herrera over the telephone] that the children were crying during the dispute and that the maternal family . . . took the girls and just threw them in the car with no car seats and were driving erratically. And [Herrera's] concern was neither [parent] called the police to file a report.

The children's caretakers did not know the aunt and grandmother would take the children to the birthday party for Julius's friend at the home of appellant's best friend. Therefore, had the caretakers known about the party, they would have known of the strong possibility appellant and Julius would be present. When asked why this concerned her, Herrera said Julius was not engaged in services or part of a visitation plan, appellant had told the Department she had no contact with Julius, the Department did not know the identity of the friends, and there was no indication these friends were appropriate and safe to be around. Herrera said the aunt and grandmother tried to leave the party because they did not want the children to be around appellant. When the aunt and grandmother left without placing the children into car seats and neither appellant nor Julius called the police, Herrera believed this demonstrated a lack of protective capacity. However, Herrera admitted the maternal aunt was in the wrong for bringing the children to the party.

Herrera said she has never refused to respond to appellant's requests to see her children, and appellant has not seen the children since February 2016. In April 2016, Herrera went to appellant's house to express her concern that she had not heard from appellant and that appellant was not compliant with her drug tests. Appellant told Herrera she was still mourning the death of Julius in February. A walk-through of appellant's house revealed no toys for the children and appellant said her sister was staying with her. Upon entering appellant's bedroom, Herrera saw a man, wearing no shirt, sitting on the bed. Appellant did not identify the man, except to say he was a friend and "he wasn't going to be in her life [for] long." Herrera said the house was not safe for the children, and there were roaches on the floor and walls. Although appellant told Herrera she

had spoken to the apartment manager about the roaches, Herrera said appellant had a history of not maintaining a safe and stable home environment, or a clean house. However, Herrera admitted she did not follow up with either appellant or the apartment manager about the roach problem, and she did not know whether the issue had been resolved. On another prior visit, Herrera said she saw piles of dirty clothes that appellant left in a closet.

Herrera testified the children were living with their maternal cousin, they were thriving, and they had bonded with their caregivers whom they called "momma and daddy." Herrera said the children have consistently been with this family since the case began, they are healthy and happy, and they do not display tantrums. Herrera said the children's teachers also have seen an improvement in the children's behavior. The maternal cousin is willing to provide a permanent home for the children. Herrera believed the current caregivers have, throughout the case, demonstrated an ability to meet the needs of the children. In fact, Herrera said they "go above and beyond for these girls" and Herrera has never seen the children unkempt, they are always in clean, new clothing and shoes, the caregivers take the children to parks, and they are protective of the children.

On the other hand, Herrera believed appellant's actions endangered the children because she has continued to engage in "domestic violence [sic] relationships" with individuals who are not safe, and appellant has made impulsive decisions about the men with whom she forms a relationship, which Herrera believed spoke "volumes about her inconsistency and knowledge of what a protective parent" should be. Herrera said appellant had tested positive for drugs despite knowing she should demonstrate that she is a safe and appropriate parent. Appellant has not successfully completed her anger management class, "which has been a huge issue throughout this case."

When asked about appellant's work history, Herrera said appellant has been inconsistent, she will start a job and then hold it for only about a month. In April 2016, appellant was not employed and was living in federal housing. Appellant told Herrera only she and the two children were on the lease, but other people resided in the home.

Herrera believed termination of appellant's parental rights was in the best interest of both children because appellant did not comply with her service plan; she failed to demonstrate she could be a safe and protective parent for her children; she had not shown she can adequately parent the children; and she had not demonstrated a willingness to seek out the services available to assist her in becoming a better parent. When asked why she was concerned that appellant stopped her counseling sessions, Herrera stated that on at least three occasions, appellant said she no longer wanted visitation and she wanted to relinquish her parental rights. Herrera believed counseling would have helped appellant address these feelings and become a better parent. Appellant's failure to complete counseling suggested to Herrera that appellant did not fully understand her role as a mother and how important it is for her to care for both herself and her two children. Herrera did not believe appellant knew what her children needed now or in the future because appellant had no contact with the children. She said J.D.H does not know her mother, and J.C.H. calls her mother by her first name.

Herrera said appellant told her about a man whom she had known since she was young, and appellant did not want to hear the information Herrera had discovered about the man. This suggested appellant did not understand how important it was to have safe and appropriate people around her children. As for other support, Herrera said appellant does not have a strong relationship with the maternal side of her family, specifically her mother and siblings. Herrera said appellant's sister occasionally accompanied appellant to visits with the children, and the two

women would not be on speaking terms with each other, which would have a negative impact on the quality of the visits with the children.

Finally, L.L., the children's current caregiver, testified. L.L. said the children had been living with her for over one year, they were both doing well, were toilet trained, and achieving everything they needed to achieve. She said the children had no developmental delays. L.L. said neither child asks about their mother. She said the last "Facetime" contact the children had with appellant was April 27, 2016, but contact had stopped because appellant does not stay in touch with the children.

Ten days after the termination hearing, the trial court terminated appellant's parental rights, and appointed the Department permanent managing conservator of the children. On appeal, appellant challenges the sufficiency of the evidence in support of the trial court's finding that termination is in the children's best interest.[3]

## BEST INTEREST

A trial court may order termination of the parent-child relationship only if the court finds by clear and convincing evidence one or more statutory grounds for termination and that termination is in the children's best interest. TEX. FAM. CODE § 161.001(1), (2); § 161.206(a). There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). However, when the court considers factors related to the best interest of the child, "the prompt and permanent placement of the child in a safe

---

[3] Appellant does not challenge the sufficiency of the evidence to support the predicate findings that she engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well-being of the children; constructively abandoned the children who have been in the permanent or temporary managing conservatorship of the Department for not less than six months and the Department has made reasonable efforts to return the children to appellant, appellant has not regularly visited or maintained significant contact with the children, and appellant has demonstrated an inability to provide the children with a safe environment; and appellant failed to comply with the provisions of a court order that specifically established the actions necessary to obtain the return of the children who had been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of the children's removal from appellant for abuse or neglect.

environment is presumed to be in the child's best interest." TEX. FAM. CODE § 263.307(a). In determining whether a child's parent is willing and able to provide the child with a safe environment, we consider the factors set forth in Family Code section 263.307(b).

We also apply the non-exhaustive *Holley* factors to our analysis. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). And finally, evidence that proves one or more statutory grounds for termination may constitute evidence illustrating that termination is in the child's best interest. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002) (holding same evidence may be probative of both section 161.001(1) grounds and best interest, but such evidence does not relieve the State of its burden to prove best interest). A best interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.–San Antonio 2013, pet. denied). A trier of fact may measure a parent's future conduct by her past conduct and determine whether termination of parental rights is in the child's best interest. *Id.*

When reviewing the sufficiency of the evidence, we apply the well-established standard of review. *See* TEX. FAM. CODE §§ 101.007, 161.206(a); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (legal sufficiency); *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (factual sufficiency).

At the time of the termination hearing, J.C.H. was approximately two years old and J.D.H. was about three years old. Therefore, neither child was old enough to speak on her own behalf. However, there was testimony the older child had temper tantrums around appellant and both children wanted to leave the supervised visits. The record contains evidence of concerns regarding appellant's stability, inability to hold steady employment, domestic violence, inability to show progress in the programs devised to assist her, and various relationships with men who may not be appropriate for the children.

The record contains little information about the parental abilities of the current caregivers who wish to adopt both children or the programs available to assist them to promote the children's best interest. However, the caregivers were present at the termination hearing. L.L. testified she wants to adopt both children, and the children were achieving all their goals. According to Herrera, both children were thriving, appeared well-taken care of, healthy and happy, and they had bonded with their caregivers.

On this record, we must conclude the evidence permitted a reasonable factfinder to form a firm conviction and belief that termination of the parent-child relationship was in the children's best interest.

Sandee Bryan Marion, Chief Justice