

## Fourth Court of Appeals
### San Antonio, Texas

## MEMORANDUM OPINION

No. 04-21-00134-CV

### IN THE INTEREST OF A.L.B.

From the 37th Judicial District Court, Bexar County, Texas
Trial Court No. 2020PA00106
Honorable Charles E. Montemayor, Associate Judge Presiding

Opinion by:  Liza A. Rodriguez, Justice

Sitting:  Rebeca C. Martinez, Chief Justice
Luz Elena D. Chapa, Justice
Liza A. Rodriguez, Justice

Delivered and Filed: August 11, 2021

AFFIRMED

Appellant Mother appeals the trial court's order terminating her parental rights to her four-year-old daughter, A.L.B.[1] On appeal, she argues the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in her child's best interest. We affirm.

### CHILD'S BEST INTEREST

Under Texas law, there is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). In determining whether the child's parent is willing and able to provide the child with a safe environment, the

---

[1] To protect the identity of the minor children, we refer to the parties by fictitious names, initials, or aliases. *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

factors set out in section 263.307 of the Family Code should be considered. *See* TEX. FAM. CODE § 263.307(b).[2] In addition to these statutory factors, in considering the best interest of the child, a factfinder may also consider the nonexclusive list of factors set forth by the Texas Supreme Court in *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976).[3] The *Holley* factors are neither all-encompassing nor does a court need to find evidence of each factor before terminating the parent-child relationship. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Finally, in determining whether termination of the parent-child relationship is in the best interest of a child, a factfinder may judge a parent's future conduct by her past conduct. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied).

Appellant Mother argues that the evidence is legally and factually insufficient to support the trial court's best-interest finding. In reviewing the legal sufficiency of the evidence to support this finding, we look "at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was

---

[2] These factors include (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with: (A) minimally adequate health and nutritional care; (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development; (C) guidance and supervision consistent with the child's safety; (D) a safe physical home environment; (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and (F) an understanding of the child's needs and capabilities; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. TEX. FAM. CODE § 263.307(b).

[3] These factors include, but are not limited to, the following: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the child's best interest; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *In re E.C.R.*, 402 S.W.3d at 249 n.9 (citing *Holley*, 544 S.W.2d at 371-72).

true." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). In reviewing the factual sufficiency of the evidence, we consider disputed or conflicting evidence. *Id.* at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266). Under these standards, the factfinder is the sole judge of the weight and credibility of the evidence. *Id.*

In her brief, Appellant Mother argues all the testimony at trial supporting a best-interest finding is conclusory. After reviewing all the evidence, we disagree with this assertion. At trial, the caseworker testified that two-year-old A.L.B. came into the Department's care in January 2020 because of Appellant Mother's "involvement in drugs." During her testimony, Appellant Mother admitted that A.L.B. had been removed from her care "because of drug use on [her] behalf."

A court-ordered service plan was created for Appellant Mother to address her drug use. Appellant Mother was ordered to complete parenting classes, a substance-abuse assessment, and substance abuse rehabilitation. Appellant Mother was also ordered to take a psychological evaluation and engage in individual counseling. The caseworker testified that while Appellant Mother did engage in parenting classes, she did not complete them. Appellant Mother also took a substance abuse assessment, which stated that she needed substance abuse rehabilitation. While she did engage in the drug-treatment program, she did not complete it. The caseworker testified that Appellant Mother's current participation in a drug-treatment program was her second attempt. Thus, while A.L.B. had been in the Department's care for over a year, Appellant Mother has been unable to successfully complete a drug-treatment program.

The caseworker also testified that at the previous court setting, Appellant Mother was ordered to submit to a hair follicle test. While Appellant Mother went to the drug testing facility,

she did not submit to a test. When asked whether she had information on why Appellant Mother did not test, the caseworker replied,

> No, I don't. She claims she did test. However, I have gone through the administrator with the lab, and they state that she did not test. They did not get a sample from her. She left.

According to the caseworker, Appellant Mother was ordered to take the test on a Friday, the day after the last court hearing. The caseworker testified she knew Appellant Mother was at the lab, so she "waited until Monday for verification." The caseworker called the lab to make sure "they put a rush on that" and was informed that Appellant Mother had left without testing. The caseworker testified,

> And I checked back two weeks later to make sure that—to see if we had any test results on any kind of anything, because sometimes they will give you wrong information over the phone. And they checked, and they checked, and we checked back every day for almost two weeks, and there was nothing. And finally, I spoke with the administrator who did an investigation and they show[ed] where [Appellant Mother] came in, but she did not test. There was no sample logged.

The caseworker asked Appellant Mother about the matter, and Appellant Mother claimed to have tested. Based on these facts, the caseworker testified that Appellant Mother had not addressed the concerns that had led to A.L.B. being in the Department's care.

Appellant Mother argues in her brief that she had only five sessions remaining for her parenting classes and nine sessions remaining for her drug-treatment program, and she was still attending individual counseling sessions. In her brief, she also points to her testimony about why she missed her drug test. Appellant Mother testified at trial that she went to the lab for drug testing, but the lab could not find her referral. Thus, she had to call the caseworker to send another referral. Appellant Mother testified that she took the hair follicle test "shortly after [the caseworker] sent in the referral." She admitted the caseworker notified her that the lab stated no test had been submitted. The trial court, however, as the sole judge of the weight and credibility of the evidence,

could have found that Appellant Mother's self-serving testimony was not credible. *See In re J.O.A.*, 283 S.W.3d at 344. Relying on the testimony of the caseworker, the trial court could have determined that Appellant Mother has not addressed the underlying drug issue that led to the removal of A.L.B.

Further, there was evidence that Appellant Mother did not have a stable home for A.L.B. The caseworker testified, "We don't know where she lives, or how she is living, or with who[m]." The caseworker asked Appellant Mother to provide information about her living situation, but Appellant Mother did not respond to the caseworker's requests. Appellant Mother admitted at trial that she did not presently have stable housing and was "staying with a friend," but claimed to be moving into her own apartment "within the next two weeks." When asked which apartment she would be moving into, Appellant Mother replied, "It's an apartment in the medical district. I can't give you the exact address right now." She admitted that she could not provide a lease, because she had not signed one: "I'm just waiting on the deposit money to sign a lease."

Additionally, the caseworker testified that Appellant Mother failed to give documentation supporting her claim of employment. The caseworker testified that Appellant Mother "continues to say she is employed, but she has shown no proof of such." According to the caseworker, Appellant Mother had claimed to be employed at three different hotels, with the Candlelight Inn being the most recent place of employment. However, Appellant Mother had not provided any proof of employment. Similarly, the CASA advocate testified to having "gotten different places that [Appellant Mother] has been employed." According to the CASA advocate, the week before trial, she asked Appellant Mother again about her employment and was told that the advocate "was harassing her employer." The CASA advocate testified that she did not believe Appellant Mother was being truthful about her employment. During her testimony, Appellant Mother claimed to have e-mailed the caseworker her "paycheck stubs," but admitted the caseworker had said she had

not received the paycheck stubs. When asked at trial whether she could provide the paycheck stubs, Appellant Mother replied, "No, because the last one, I did not receive a check stub, because it was supposed to be sent to me by e-mail, and I did not receive that one either." Again, the trial court, as the sole judge of the weight and credibility of the evidence, could have found Appellant Mother's testimony to be self-serving and not credible. *See In re J.O.A.*, 283 S.W.3d at 344.

Finally, the caseworker testified there was very little bond between A.L.B. and Appellant Mother. According to the caseworker, during visitation, there was "limited engagement between her and the child." The caseworker testified about "concerning behaviors" during visitations:

> [A.L.B.] would cry and scream, and not want to go visit with her mother on multiple visits. Mother attempted to redirect her, and [A.L.B.] was not responding to mother. And it ended up that [A.L.B.] put herself in a corner, and cried and screamed herself to sleep in a corner.

In contrast, the caseworker testified that A.L.B. had developed a strong bond with her current placement, fictive kin with whom A.L.B. had been placed since the beginning of the case. According to the caseworker, A.L.B. refers to her placement as "grandmother" and "nana." The caseworker testified she has observed A.L.B. and her placement "multiple times":

> The relationship between the two is nurturing. [A.L.B.] loves her, she is very bonded to her, she is—every—everything that she needs to be; she's compassionate and caring to [A.L.B.], she is—redirects her appropriately. [A.L.B.] responds to redirection from her. She readily goes to the caregiver for attention and for care.

According to the caseworker, the long-term plan for A.L.B. was adoption by her placement. Similarly, the CASA advocate, who has worked with A.L.B. for over a year, testified that A.L.B. is very bonded to her current placement. A.L.B. lives on a farm with her placement. The CASA advocate testified that A.L.B. was "very excited to show [her] the [farm] animals." According to the CASA advocate, A.L.B. is "very well cared for by [the placement]." "[The placement] does enforce appropriate behavior; she doesn't allow inappropriate behavior." The CASA advocate has seen A.L.B. grow developmentally while in her placement. According to the advocate, the first

time she met A.L.B., she was "pretty withdrawn," but is now a "happy go lucky" little girl. A.L.B.'s "speech has developed tremendously." She characterized A.L.B. as being "in a loving environment."

In reviewing the evidence in the light most favorable to the trial court's best-interest finding, we conclude the trial court could have formed a firm belief or conviction that it was in A.L.B.'s best interest to terminate Appellant Mother's parental rights. *See In re J.O.A.*, 283 S.W.3d at 344. With regard to factual sufficiency, we note that there was evidence that Appellant Mother had engaged in her services, along with Appellant Mother's own testimony that she had housing and employment. Nevertheless, in considering the entire record, we conclude the disputed evidence that a reasonable factfinder could not have credited in favor of the best-interest finding was not so significant that a factfinder could not have reasonably formed a firm belief or conviction that termination was in A.L.B.'s best interest. *See id*. at 345. Therefore, we hold the evidence is also factually sufficient to support the trial court's best-interest finding.

## CONCLUSION

We affirm the trial court's order terminating Appellant Mother's parental rights.

Liza A. Rodriguez, Justice