

## Fourth Court of Appeals
### San Antonio, Texas

## MEMORANDUM OPINION

No. 04-19-00806-CV

**IN THE INTEREST OF A.M.M.**, a Child

From the 408th Judicial District Court, Bexar County, Texas
Trial Court No. 2018-PA-02711
Honorable Cynthia Marie Chapa, Judge Presiding

Opinion by:     Liza A. Rodriguez, Justice

Sitting:     Rebeca C. Martinez, Justice
            Luz Elena D. Chapa, Justice
            Liza A. Rodriguez, Justice

Delivered and Filed:   May 6, 2020

AFFIRMED

Appellant S.M.[1] appeals the trial court's order terminating her parental rights to her daughter, A.M.M. On appeal, S.M. challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of her parental rights was in A.M.M.'s best interest.  We affirm the trial court's judgment.

### STANDARD OF REVIEW

To terminate parental rights pursuant to section 161.001 of the Texas Family Code, the Department has the burden to prove by clear and convincing evidence that parental rights should be terminated pursuant to one of the predicate grounds in subsection 161.001(b)(1) and that

---

[1] To protect the identity of the minor children, we refer to the parties by fictious names, initials, or aliases. *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

termination of parental rights is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(1), (2). In reviewing the legal sufficiency of the evidence to support these findings by the trial court, we look "at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). In reviewing the factual sufficiency of the evidence, we consider disputed or conflicting evidence. *Id.* at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266). Under these standards, the trial court is the sole judge of the weight and credibility of the evidence. *Id.*

## CHILD'S BEST INTEREST

In her sole issue on appeal, S.M. asserts the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in the best interest of A.M.M. Under Texas law, there is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). In determining whether the child's parent is willing and able to provide the child with a safe environment, a court should consider the factors set out in section 263.307 of the Family Code. *See* TEX. FAM. CODE ANN. § 263.307(b).[2] In addition to these statutory factors, in considering the best interest of the

---

[2] These factors include (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate

child, a court may also consider the nonexclusive list of factors set forth by the Texas Supreme Court in *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976).[3] The *Holley* factors are neither all-encompassing nor does a court need to find evidence of each factor before terminating the parent-child relationship. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). In determining whether termination of the parent-child relationship is in the best interest of a child, a court may judge a parent's future conduct by her past conduct. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). Finally, evidence establishing one or more of the statutory grounds for termination may also be probative of best interest, although it does not relieve the Department of its burden to prove best interest. *In re C.H.*, 89 S.W.3d at 28.

A bench trial was conducted on November 4, 2019. The evidence consisted of the testimony of three caseworkers and S.M., plus S.M.'s family service plan and a paternity registry search. The first witness was Lorena Arnold, an investigative caseworker for the Department, who testified that the current case began when S.M. called and asked the Department to take custody of three-year-old A.M.M. because she was causing S.M. so much stress it would cause S.M. to black out and because A.M.M. was the product of rape. Arnold went to S.M.'s home along with a San Antonio Police Department officer. Arnold observed S.M. yelling at A.M.M., calling her a

---

agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with: (A) minimally adequate health and nutritional care; (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development; (C) guidance and supervision consistent with the child's safety; (D) a safe physical home environment; (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and (F) an understanding of the child's needs and capabilities; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. TEX. FAM. CODE ANN. § 263.307(b).

[3] These factors include, but are not limited to, the following: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the child's best interest; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *In re E.C.R.*, 402 S.W.3d 239, 249 n.9 (Tex. 2013) (citing *Holley*, 544 S.W.2d at 371-72).

"little shit" and telling her she "didn't want her," "didn't love her," and "she was a product of rape" and "a terrible child." Despite efforts by Arnold and the officer to establish a safety plan and send A.M.M. to stay with family to avoid removal, S.M. refused to cooperate. When S.M. began threatening Arnold and the officer, the child was removed from the home.

Arnold testified that S.M. appeared to be "under the influence" at the time of removal because she was rambling, speaking fast, and acknowledged having blackouts. S.M. stated she was a heroin addict but claimed to be clean for seven years. However, Arnold was concerned about drug use by S.M. and asked her to take a drug test. S.M. refused the test. S.M. told Arnold that she was bipolar and also suffered from schizophrenia and depression. At the time A.M.M. was removed, Arnold was aware that S.M. had one previous CPS case history involving A.M.M.

At the time she was removed, A.M.M. was visibly shaken, had red watery eyes, and appeared frightened of S.M. After her removal, it was determined that A.M.M. had marks on her buttocks and arms. S.M. admitted that she would hit A.M.M. "when she got upset with her." Arnold also testified that A.M.M. told her several times that a man with "a clown face" had repeatedly come into her room and "licked her where the pee comes out," i.e., sexually abused her.

Palmira Granado was the caseworker on S.M.'s previous CPS case which was ultimately dismissed. She was also the caseworker for the first six months of the current case. When Granado first met S.M. in October 2017, S.M. acknowledged a history of heroin abuse. S.M. claimed not to have a current drug problem but refused to drug test on several occasions. S.M. admitted smoking marijuana when she was frustrated or stressed out. Granado testified there was concern that S.M. was using heroin and methamphetamine as well as marijuana during both CPS cases. After clean urinalysis results became a precondition for visits with A.M.M. in March 2019 in the current case, S.M. had no more visits with A.M.M. because she could not provide a clean urinalysis.

Granado attempted to engage S.M. in mental health treatment several times. S.M. submitted to a psychological assessment and began medication. She stopped taking the medication after about one month, stating she was unable to take it due to an "allergic reaction" and lack of finances. Granado stated that although S.M. was offered medical assistance, she continued to refuse the need for medication and constantly made excuses for not taking her medication. In May 2019, S.M. called Granado and told her she wanted to commit suicide. Granado was on the phone with S.M. when the police arrived for a welfare check and could hear S.M. get angry and start cursing at the officers and at her. The mobile crisis team was called, but S.M. refused to go to the hospital for treatment. Later that month, S.M. again expressed suicidal thoughts to Granado, but again refused counseling and treatment. Granado's involvement in the case ended shortly after that incident. Throughout the case, Granado continued to have concerns about S.M.'s mental health and history of substance abuse because she refused help.

Granado testified that S.M. submitted to a full drug and alcohol evaluation during the first CPS case and inpatient drug treatment was recommended. Although a bed was waiting for her at Alpha Home, it was rescheduled three times because S.M. failed to show. During the current case, S.M. completed a level one outpatient drug program through the Center for Health Care Services. S.M. disclosed to Granado that she was not completely honest about her drug use during the evaluation for the current case.

Granado recommended that S.M.'s parental rights to A.M.M. be terminated due to continuing concerns about S.M.'s drug use, mental health, anger issues, and absence of a bond with her child. Granado testified that during visits A.M.M. showed signs of fear toward S.M. and at one visit asked if S.M. "was going to lock her in the closet in the dark again." When A.M.M. referred to sexual abuse with the "cucuy," S.M. appeared uncertain what to do. S.M. also got frustrated with A.M.M.'s lack of maturity and attention span and did not seem to understand her

developmental stage. Although S.M. had a stable home, she never provided any proof of employment, income, or other financial means of support for her child. A.M.M. was currently placed with S.M.'s brother and Granado testified they had developed a great bond. Granado believed that A.M.M. was thriving in her current placement with her maternal aunt and uncle and had been able to bond with other family members there, including cousins who were close in age. In addition, A.M.M. was able to bond with her brother who resides with their grandmother; S.M.'s parental rights to A.M.M.'s brother were also previously terminated. The placement with A.M.M.'s maternal aunt and uncle provides for all of A.M.M.'s needs very well and has established a good routine and good permanency for her. She is enrolled in pre-kindergarten and the plan is for A.M.M. to be adopted by her maternal aunt and uncle.

Caseworker Paula Bentancourt took over the case from Granado in late May 2019, about six months before trial. Bentancourt testified she was recommending termination of S.M.'s parental rights based on her positive drug tests and continued concerns about her refusal to comply with treatment recommendations for her mental health diagnosis. During a visit to S.M.'s apartment about three weeks before trial, Betancourt had to repeatedly knock on the door and could hear S.M. inside repeatedly yelling "leave me alone" and "get out" in an "almost crying, screaming, eerie kind of way." S.M. eventually opened the door and indicated she was alone and the screaming was "her way of praying," explaining that "the devil gets in her head, and that's her way of telling him to get out." Betancourt encouraged S.M. to reengage in psychiatric treatment numerous times, but S.M. insisted she did not need medication.

Betancourt also had concerns about the stability of S.M.'s housing and lack of employment and income. S.M. was nine months' behind on her rent for which she paid only $4 per month. Betancourt believed that S.M.'s father gave her money to pay rent. S.M. never provided proof of

income during either CPS case, which was a "major concern." To Betancourt's knowledge, S.M. had not applied for any employment although S.M. told Betancourt she had an interview.

S.M. did not have a clean urinalysis result during the six months Betancourt was her caseworker. Because a clean drug test was a precondition for visiting with A.M.M., Betancourt never had an opportunity to observe S.M. interact with A.M.M. In addition, S.M. admitted to Betancourt that she used marijuana. Although S.M. completed the intake process, she did not engage in any drug treatment from May 2019 to October 2019 and did not comply with a reassessment until the month of trial.

Betancourt testified that in her opinion shared conservatorship between S.M. and the maternal aunt and uncle was not a good idea because they were very frustrated with S.M. and her behaviors. At one point, they gave notice they would no longer keep the child, but reconsidered and expressed their love for A.M.M. and their desire to keep her in their home. The maternal aunt and uncle want to adopt A.M.M. and are unwilling to share conservatorship with S.M. because they do not believe they could work with S.M. and they believe adoption is in A.M.M.'s best interest. Betancourt stated that due to S.M.'s instability she believed it was in A.M.M.'s best interest to be adopted by her maternal aunt and uncle.

The only contrary evidence came from S.M. during her testimony. S.M. described a very different recollection of the night of A.M.M.'s removal. S.M. agreed that she called the Department but denied that she wanted her child removed from the home. S.M. stated she only requested assistance with counseling and family-based services and did not anticipate the arrival of law enforcement or removal of the child. S.M. conceded becoming upset once she realized her daughter was being removed. S.M. denied that A.M.M. was in the condition described by the caseworker, stating she was not crying or afraid and there was nothing wrong with her. S.M. also denied that she was rambling or speaking quickly and denied that she was under the influence of

any drugs. She admitted to being a heroin user in the past but stated she was not using at the time she called the Department. S.M. also denied telling the caseworker that she was diagnosed as having bipolar disorder and schizophrenia. She admitted to being prescribed medication, however, and stated she was taking it at the time.

During the first CPS case, S.M. believed she had a very strong bond with A.M.M., stating she was involved in school activities and had successful visits supervised by her brother. She denies that the caseworker ever expressed any concerns about her visits with A.M.M. S.M. admitted that during that time she stopped taking her prescribed medication because she was allergic to it. After telling her doctor and being reassessed, S.M. was prescribed a new medication. She was unable to begin the new medication because she did not have the money to pay for it and was not on Medicaid. She stated however that she "didn't get the exact price." S.M. admitted she had suicidal thoughts during the course of the current case, i.e., within the last six months, but she was still not taking her prescribed psychiatric medication at the time of trial.

S.M. denied relying on her family for financial support and stated that her father had been helping her only during the last six months before trial. Prior to that time, S.M. stated she was solely responsible for supporting herself and A.M.M. S.M. admitted falling behind on "late fees" for her housing payments but stated she had paid them and now had a three-month credit. S.M. admitted difficulty in finding employment. She testified that she had made attempts to find a job but she does not have any work history, training or vocational classes, and only an 11th grade education. Her only previous job was at Burger King from 2014 to 2015. S.M. stated that she missed a job interview due to being present for trial.

S.M. testified that she had been arrested more than five times for the offenses of robbery, theft, and criminal trespass. She went to state jail for robbing someone by "beat(ing) her up" and taking "whatever she had." S.M. started smoking marijuana at 12 years old and admitted she has

struggled with both heroin and methamphetamine use. S.M. stated that the last time she used marijuana as a "stress reliever" was September. S.M. testified she knew the man who sexually assaulted A.M.M. and identified him by name at trial. She stated she did not know how many times he sexually assaulted A.M.M. and it was not reported to the police. S.M. denied ever locking A.M.M. inside the closet and stated that A.M.M. would "run to the closet herself." S.M. testified that with additional time she could complete her family services and she was confident she could co-parent with her brother.

S.M. argues on appeal that the Department failed to meet its burden to prove by clear and convincing evidence that termination of her parental rights is in A.M.M.'s best interest due to the absence of evidence on some of the statutory factors and *Holly* factors. However, these factors serve only as non-exhaustive guidelines which courts may consider in determining best interest. *In re C.H.*, 89 S.W.3d at 27. The absence of evidence on some factors does not preclude a factfinder from reasonably forming a strong conviction that termination is in a child's best interest, particularly if there is undisputed evidence the parental relationship endangered the child. *Id.* After reviewing the evidence presented at the termination hearing relevant to the above factors, we conclude the evidence is legally and factually sufficient to support the trial court's best-interest finding that termination of S.M.'s parental rights is in A.M.M.'s best interest. *See In re J.O.A.*, 283 S.W.3d at 344. Based on S.M.'s past behavior including her criminal history, continued drug use as shown by positive tests and refusals, failure to acknowledge her drug problem and to fully engage in and complete drug treatment, failure to take the medications prescribed to treat her mental health condition, and failure to obtain employment and a steady source of income, along with her endangerment of A.M.M. through her infliction of emotional abuse and physical injury, failure to protect the child from sexual abuse while in the home, and failure to report the sexual abuse once she discovered the identity of the perpetrator, the trial court could have formed a firm

belief that termination of S.M.'s parental rights was necessary to protect A.M.M. in the future and was in A.M.M.'s best interest. *See In re E.D.*, 419 S.W.3d at 620. That A.M.M. is thriving in the current placement with her maternal aunt and uncle in a stable and nurturing environment with a planned adoption further supports the trial court's finding that termination is in A.M.M.'s best interest. The trial court could have disbelieved the contrary evidence presented by S.M. and the disputed evidence was not such that a reasonable factfinder could not have resolved it in favor of its finding of best interest. *See In re J.O.A.*, 283 S.W.3d at 345.

## CONCLUSION

Based on the foregoing reasons, we overrule S.M.'s issue on appeal and affirm the trial court's judgment.

Liza A. Rodriguez, Justice