

## Fourth Court of Appeals
### San Antonio, Texas

**MEMORANDUM OPINION**

No. 04-21-00334-CV

**IN THE INTEREST OF L.J.C.**, X.I.C., Z.S.C., E.A.C., L.C.C., and A.R.G., Children

From the 407th Judicial District Court, Bexar County, Texas
Trial Court No. 2020-PA-00922
Honorable Charles Montemayor, Judge Presiding

Opinion by:    Liza A. Rodriguez, Justice

Sitting:    Rebeca C. Martinez, Chief Justice
Luz Elena D. Chapa, Justice
Liza A. Rodriguez, Justice

Delivered and Filed: February 2, 2022

AFFIRMED

Mother (M.G.) appeals the trial court's order terminating her parental rights to the children.

We affirm.

### BACKGROUND

The six children who are the subject of this case ranged in age from an infant to a six-year-old at the time of removal. The Department removed the children from Mother's custody in May 2020 after six months of family based services based on concerns for Mother's continued drug use and unsanitary living conditions in the home. After a six-month extension, a bench trial commenced via Zoom on July 9, 2021. The trial court heard testimony from the Department's family based services worker and the assigned legal caseworker, as well as from Mother and her counselor. After considering all the evidence, the trial court found the following predicate grounds

under section 161.001(b)(1) support termination of Mother's parental rights: failure to complete her court-ordered family service plan under subsection (O); and continued use of a controlled substance in a manner that endangered the health and safety of the children under subsection (P). TEX. FAM. CODE ANN. §161.001(b)(1)(O),(P). The trial court also found that termination of Mother's parental rights was in the best interests of all the children. *Id.* § 161.001(b)(2). The Department was appointed permanent managing conservator of the children. On appeal, Mother asserts the evidence is legally and factually insufficient to support the trial court's best interest finding.

### STANDARD OF REVIEW

To terminate parental rights pursuant to section 161.001 of the Texas Family Code, the Department has the burden to prove by clear and convincing evidence that parental rights should be terminated pursuant to one of the predicate grounds in subsection 161.001(b)(1) and that termination of parental rights is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(1), (2). In reviewing the legal sufficiency of the evidence to support these findings, we look "at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). In reviewing the factual sufficiency of the evidence, we consider disputed or conflicting evidence. *Id.* at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266). Under these standards, the factfinder is the sole judge of the weight and credibility of the evidence. *Id.*

## CHILDREN'S BEST INTEREST

Under Texas law, there is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). In determining whether the child's parent is willing and able to provide the child with a safe environment, the factors set out in section 263.307 of the Family Code should be considered. *See* TEX. FAM. CODE ANN. § 263.307(b).[1] In addition to these statutory factors, in considering the best interest of the child, a factfinder may also consider the nonexclusive list of factors set forth by the Texas Supreme Court in *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976).[2] The *Holley* factors are neither all-encompassing nor does a court need to find evidence of each factor before terminating the parent-child relationship. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). In determining whether termination of the parent–child relationship is in the best interest of a child, a factfinder may judge a parent's future conduct by her past conduct. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio

---

[1] These factors include (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with: (A) minimally adequate health and nutritional care; (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development; (C) guidance and supervision consistent with the child's safety; (D) a safe physical home environment; (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and (F) an understanding of the child's needs and capabilities; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. TEX. FAM. CODE § 263.307(b).

[2] These factors include, but are not limited to, the following: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the child's best interest; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *In re E.C.R.*, 402 S.W.3d 239, 249 n.9 (Tex. 2013) (citing *Holley*, 544 S.W.2d at 371–72).

2013, pet. denied). The predicate grounds for termination may also be probative of best interest. *In re C.H.*, 89 S.W.3d at 28.

### Mother's Continued Drug Use and Failure to Complete Treatment

There was considerable evidence concerning Mother's pattern of drug use prior to and during the pendency of the case. Stephanie Banks, the Department's Family Based Safety Services worker, testified the initial referral in December 2019 was for alleged drug use by Mother because she and her newborn A.R.G. both tested positive for marijuana at the baby's birth. Banks stated that Mother has a long history of drug use with "at least three cases with CPS where her children were born positive for drugs." Mother also admitted to Banks that she was on probation for DWI. In an attempt to avoid removal of the children, Mother was referred for a drug and alcohol assessment, outpatient drug treatment, counseling, and a psychological evaluation. Mother began the outpatient drug treatment and counseling but was unsuccessfully discharged. Mother only submitted to some of the random drug tests requested by the Department. Banks testified Mother completed one hair follicle test that was positive for marijuana. Mother refused to do another test and admitted to Banks she had relapsed and would test positive. Mother admitted using marijuana and stated she used it because she felt overwhelmed. To assist Mother, the Department offered protective childcare for the children who were not in school and listed the grandmother and Mother's sister as care-providers under the safety plan. The children were ultimately removed due to the Department's concerns about Mother's continued drug use and lack of engagement and progress on the services offered, as well as unsafe conditions in the home.

The Department caseworker assigned to the case after removal, Dietra Marquez, testified that the children were removed in June 2020, after six months of family based services, due to Mother's June 9th drug test being positive for cocaine and marijuana. Thereafter, Mother tested positive on November 24, 2020 for increased levels of marijuana and tested positive in March

2021 for "almost double" the level of marijuana shown on the June 2020 test. Mother failed to take the drug tests requested after March 2021, including the test requested one to two weeks before the July 9, 2021 trial. According to Marquez, Mother denied having a substance abuse problem.

Mother's family service plan required her to complete a drug assessment, a psychological evaluation, individual therapy, domestic violence classes and parenting classes. According to Marquez, the domestic violence concern arose out of the children's claims that they were scared in the home and would "often have to hide in the tub when mom and dad were fighting." Mother completed the drug assessment, psychological evaluation, domestic violence classes, and parenting classes. The drug assessment resulted in a recommendation that Mother continue outpatient drug treatment. As of the date of trial, Mother had not successfully completed drug treatment.

Marquez testified that Mother was currently engaged in services with her third therapist, having failed to make contact with the first therapist referred by the Department and having failed to establish a good connection with the second therapist due to disagreements about inpatient drug treatment. According to Marquez, Mother's progress in therapy was "pretty minimal." Mother's current therapist, Victoria Caylor, testified she began treating Mother on March 17, 2021 and Mother has completed seven sessions. The areas of concern are "adjustment disorder with anxiety and depressed mood, poor decision making, parenting issues, substance abuse issues, lack of responsibility and accountability." Mother has made limited progress due to ongoing lack of accountability and responsibility. Mother admitted past drug use but claimed she was no longer using drugs. Caylor was aware of Mother's positive drug test in March 2021 and her failure to drug test since then; she agreed it was "concerning." Mother informed Caylor of her prior CPS history and Caylor was aware that at least three of her other children were born drug-positive.

Caylor did not believe it would be safe for the children to be returned to Mother without her taking accountability and did not believe Mother was ready for reunification.

Finally, Mother testified that she used marijuana to "deal with everything going on" and now understands it is not the best option and recognizes her mistakes. Mother conceded that she has a drug problem and has "for quite a while." She is still attending outpatient drug treatment. Mother stated she last used drugs in March 2021 when she tested positive for marijuana, and that if the court ordered her to do a hair follicle test right now, "it shouldn't come out positive." Mother explained that she "just has not been able to make it" to any drug tests since March 2021. She did not take the most recently requested drug test because she was already at work when she got the message and her shift did not end until 10:00 p.m.; she replied to Marquez but did not ask to take the test the next day. Mother also stated she did not understand how the pre-removal drug test came back positive for cocaine because she only uses marijuana. Mother asked the court for more time to continue working with her therapist and doing drug counseling.

According to Banks and Marquez, the main reason for the children's removal was the Department's concern about Mother's "persistent relapsing" drug use and the danger it posed to the children's safety in the home. Mother had been engaged in an outpatient drug treatment program since December 2019 without a successful discharge. Marquez testified the Department's initial concern about Mother's relapsing drug use still existed at the end of the case eighteen months later and supported termination as being in the children's best interest.

A trial court may judge a parent's future conduct by his or her past conduct in determining whether termination is in the child's best interest. *In re E.D.*, 419 S.W.3d at 620. Based on the evidence of Mother's drug use before and during the case, including having three other children born drug-positive since 2012, the trial court could have concluded that Mother's struggle with continued drug use weighed in favor of termination being in the children's best interest. Further,

according to Department policy, Mother's failure to submit to random drug tests when requested by the Department are considered positive results. *See In re C.J.Y.*, No. 04-20-00009-CV, 2020 WL 3441248, at *5 (Tex. App.—San Antonio June 24, 2020, pet. denied) (mem. op.); *see also In re E.R.W.*, 528 S.W.3d 251, 265 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (a fact finder can reasonably infer that a parent's failure to submit to court-ordered drug tests indicates the parent is avoiding testing because they were using illegal drugs). Finally, the trial court found by clear and convincing evidence that Mother continued to use drugs during the case in a manner that endangered the children's welfare under subsection 161.001(b)(1)(P), and Mother does not challenge that predicate finding on appeal. *See In re C.H.*, 89 S.W.3d at 28 (predicate findings may be probative of best interest).

### *Children's Needs and Desires*

At the time of trial, the six children's ages were between two and eight years old. The four oldest children were placed with the maternal grandparents in Kansas. The two youngest children were living with a foster family in San Antonio with planned placement with the grandparents in the future. "When children are too young to express their desires, the fact finder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent." *In re S.J.R.-Z.*, 537 S.W.3d 677, 693 (Tex. App.—San Antonio 2017, pet. denied). There was no testimony about the desires of the older children.

Both Banks and Marquez testified the children have behavioral and mental health issues. Banks testified that, as part of the family based services offered prior to removal, one of the children was referred for a psychological evaluation and the children under the age of three were referred to an Early Childhood Intervention program, but Mother did not follow through with the services. Banks had concerns for the children during the six months prior to removal based on unsafe and unsanitary conditions in the apartment as well as Mother's drug use. Specifically,

during one home visit, Banks observed the children sleeping on soiled mattresses with no sheets, with piles of dirty clothes around, and roaches crawling on the walls. When she visited the children at school, Banks learned there were concerns that they had a lot of absences and tardies, came to school dirty, and got into fights.

Marquez testified about each child's particular needs and issues. Eight-year-old L.J.C. has "some mental health issues" consisting of depressive mood disorders and sometimes acts out aggressively toward her younger siblings. She also made an outcry of sexual abuse that occurred at Mother's sister's house in San Antonio and was in therapy in San Antonio. The Department was waiting for Medicaid in Kansas to begin coverage and L.J.C. would then be reengaged in therapy in Kansas. She was placed with the grandparents in Kansas on June 12, 2021, one month before trial.

X.I.C., seven years old, was also placed with the grandparents in Kansas at the same time as L.J.C. He had "previous mental health concerns" and received in-patient treatment twice at Clarity for physical aggression. However, Marquez stated he has adjusted well to living with his grandparents and siblings and is "getting a lot of the love and affection and … attention" that he needs. X.I.C. has also improved by knowing he will have long-term stability.

Six-year-old Z.S.C. was placed with the grandparents in Kansas on May 1, 2021, along with her sibling four-year-old E.A.C. Z.S.C. has been "acting out more in a sexual nature, even though she has not made an outcry." The Department has concerns there may have been some sexual abuse based on her behaviors. On one occasion, the grandfather reported that when he arrived home from work he saw Z.S.C. running around naked in the garage; E.A.C. was also undressed but was wearing underwear. Marquez testified Z.S.C. stated she chose to undress and asked E.A.C. to undress too, but there was no physical touching of any private areas. Z.S.C. also reported kissing E.A.C. and X.I.C. on the lips.

E.A.C. had two in-patient admissions to Clarity, a mental health treatment facility, by the age of four years old. He had "some mood issues, and aggression, and self-harming, and suicidal thoughts at that time." He has adapted well to being in Kansas with his grandparents but does "seem to act out more aggressively towards the siblings, especially Z.S.C., although … medications seem to be helping and that will have to [be] managed long term."

Marquez testified that the two youngest children, three-year-old L.C.C. and two-year old A.R.G., are placed in a foster home in San Antonio that is meeting all their needs. Testing is ongoing for L.C.C. based on some indications of autism. Both children require special formula and are receiving "all-around services for speech, PT, and OT." L.C.C. recently had surgery to remove his tonsils and adenoids to improve his breathing and sleeping. The two youngest children's need for additional testing and treatment in Texas and the concern about sexual acting out by some of their older siblings has delayed placement of the two youngest with the grandparents although that is still a goal.

### Ability of Proposed Placement(s) to meet Children's Needs and Permanency Goals

Marquez testified the Department staggered the placement of the four oldest children with the maternal grandparents because the children's needs are "significant." The Department wanted to give the children and grandparents time to adjust and to ensure the grandparents could meet the children's needs. The four oldest children have bonded with their grandparents and have improved since their placement. Specifically, the children have found "stability within their mental health." The grandparents can provide a safe and stable environment for the children and have demonstrated they can take care of their physical and emotional needs. The grandparents passed a home study and Mother admitted that their home provides a safe and stable environment for the children. Marquez stated the transition in getting Medicaid started for the children in Kansas has been the hardest, but the grandparents are "very dedicated to getting them the help that they need

and really talking through their behaviors" and are willing to ask for help. The grandmother worked for a psychiatrist and has access to help and resources, and she understands the children have a lot of mental health challenges right now. The grandparents have been active in doing everything needed to get the children the services they need in Kansas, and have been able to manage the children's behaviors during the transition period. The Department's permanency goal for the four oldest children is adoption by the grandparents. The foster home where the two youngest children are placed is able to meet their needs and provides a safe, stable home environment. The Department's plan is to reunite the two youngest children with the rest of their siblings in the grandparents' home, but if their placement with the grandparents is ultimately not an option, their current placement would lead to permanency for the two youngest children. In Marquez's opinion, termination of Mother's parental rights was in all the children's best interests.

### *Mother's Parental Abilities to Meet the Children's Needs*

Marquez testified that all the children are bonded with Mother. During the pendency of the case, Mother visited with the children weekly and her visits with the children were appropriate; she missed less than five visits during the eighteen-month length of the case. After the four oldest children were placed in Kansas in May and June, 2021, Mother had virtual visits with them. Mother last saw the two youngest children in early June.

With respect to whether Mother could provide a safe and stable home for the children, Banks testified to the unsanitary and unsafe conditions of the home, including a roach infestation, at the time family based services were initiated. When the children were removed six months later, Marquez stated they were physically fine but there were still concerns about the condition of the home that could pose a danger to the children. Specifically, at removal, Marquez observed there was still a roach infestation throughout the home, with roaches in the beds, the clothes, and "all over the house," even crawling over the bottles and formula. Mother told Marquez that she had

reported the problem to the landlord. At trial, Mother testified she has lived in the same subsidized apartment for three and one-half years and a lot of the apartments have the same problem with roaches. She complained to the landlord and he switched pest control companies and the problem is "pretty much under control."

Mother testified she has worked for 711 convenience stores since August 2020. Marquez stated Mother provided her with a work schedule about six months prior to trial, but no pay stubs. Mother attributed her failure to fully comply with her family service plan, including completing requested drug tests, to the difficulty of scheduling classes or tests due to conflicts with her work schedule and the pandemic. Mother conceded that she has a long CPS history that began in 2012, but explained that she has always completed the required services so the children have remained in her care. In this case, Mother stated she "bumped heads" with Banks from the beginning and got off on the wrong foot with the Department. The dismissal deadline for the case was extended to eighteen months to provide Mother with additional opportunities to complete drug treatment and individual therapy. Despite knowing the consequences of a failure to fully cooperate with the Department, Mother did not successfully complete drug treatment or submit to all requested drug tests and only reengaged in therapy three months before trial. Mother agreed that she has "a pattern of trying to do the right thing, and then relapsing since 2012."

With respect to the children's emotional and mental health needs, Mother testified she could help the children with their mental health issues "in whatever way I can." She stated the children have never been separated from her before and she believed a lot of their "acting out" was due to dealing with the emotions and trauma of the removal; the children did not have "all of these issues" before their removal. According to Mother, before removal X.I.C. was the only child with anger issues and L.L.C. did not have any signs of autism, although he was young. Marquez testified that Mother does not have a full understanding of the children's mental health issues.

Mother's current therapist testified that she herself has made "limited progress," particularly with respect to accountability and substance abuse. In her therapist's opinion, Mother is not ready for reunification with the children and it would not be safe to return the children to her. Marquez testified to the Department's position that Mother has not demonstrated that she can take care of the physical and emotional needs of the children now or in the future, or that she can provide a safe home environment particularly in view of the evidence of Mother's continued drug use.

Finally, Mother testified she has a relationship with her father and knows the children are in good hands in his home. Mother requested that the two youngest children be placed with her father. Mother indicated that she just wants to be involved and maintain contact or visits with the children. Mother requested that her parental rights remain in place as a possessory or secondary conservator with her father as the primary or legal conservator of the children.

Having reviewed the record and considered all the evidence in the appropriate light of each standard of review, we conclude the trial court could have reasonably formed a firm belief that termination of Mother's parental rights was in the best interest of all the children. *See In re J.O.A.*, 283 S.W.3d at 344-45.

## CONCLUSION

Based on the foregoing reasons, we affirm the trial court's order terminating Mother's parental rights to the children.

Liza A. Rodriguez, Justice