

## Fourth Court of Appeals
### San Antonio, Texas

### MEMORANDUM OPINION

No. 04-24-00845-CV

**IN THE INTEREST OF H.E.B.**, a Child

From the 224th Judicial District Court, Bexar County, Texas
Trial Court No. 2023PA01002
Honorable Brenda Chapman, Judge Presiding

Opinion by:      Rebeca C. Martinez, Chief Justice

Sitting:         Rebeca C. Martinez, Chief Justice
                 Irene Rios, Justice
                 Velia J. Meza, Justice

Delivered and Filed: May 14, 2025

AFFIRMED

This accelerated appeal arises from the trial court's order, signed after a bench trial, that terminates the parental rights of appellant B.R. ("Mother"), the biological mother of H.E.B. ("Child"), and appoints the Texas Department of Family and Protective Services (the "Department") as Child's permanent managing conservator.[1] In Mother's first two issues, she challenges the legal and factual sufficiency of the evidence supporting the trial court's findings that Mother failed to comply with the provisions of a court order that specifically established the actions necessary for Mother to obtain the return of Child, *see* TEX. FAM. CODE ANN.

---

[1] To protect the identity of the minor child in this appeal, we refer to the child, mother, and other family members by pseudonyms. *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

§ 161.001(b)(1)(O), and that termination of her parental rights is in the best interest of Child. *Id*. § 161.001(b)(2). In Mother's third issue, she contends that the trial court abused its discretion in making its conservatorship finding where its termination order is based on insufficient evidence. We affirm.

## I. BACKGROUND

In June 2023, the Department initiated the underlying proceeding by filing a petition to terminate Mother's parental rights to Child. Child was placed with J.B., Child's maternal first cousin once removed who later, at trial, testified that he maintained more of an "uncle-type" relationship to Child (hereinafter "Uncle"). Thereafter, the trial court signed an "Order for Protection of a Child in an Emergency" that, among other things, appointed the Department as Child's temporary sole managing conservator. In the "Temporary Order Following Adversary Hearing" (hereinafter "service plan order"), the trial court ordered Mother to "comply with each requirement set out in the Department's original, or any amended, service plan during the pendency of this suit." [2]

By the time that the Department's request to terminate the parent-child relationship between Mother and Child proceeded to trial in October 2024, Child was fifteen years old. The trial court considered the testimony of: (1) Courtney Braune, a former employment case manager at American GI Forum National Veterans Outreach Program; (2) Erica Divine, a licensed professional counselor; (3) Samantha Martinez, a case worker in the Department's conservator unit; (4) Uncle; and (5) Jill Homes, a CASA volunteer.

After the trial, the trial court signed an order stating that it found by clear and convincing evidence that: (1) Mother failed to comply with specific provisions of a court order (subsection

---

[2] At trial, the service plan was admitted into evidence.

(1)(O) failure to comply with court order); and (2) termination of the parent-child relationship between Mother and Child is in Child's best interest (subsection (b)(2) best interest).[3] *Id*. §§ 161.001(b)(1)(O), 161.001(b)(2).  The order designates the Department as Child's permanent managing conservator.  Mother timely appeals.

## II. DISCUSSION

### A.    Standard of Review

A parent-child relationship may be terminated, pursuant to section 161.001 of the Texas Family Code, only if the trial court finds by clear and convincing evidence one of the predicate grounds enumerated in subsection (b)(1) and that termination is in a child's best interest.  *See id.* § 161.001(b)(1), (2).  Clear and convincing evidence requires "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  *Id*. § 101.007.

We review the legal and factual sufficiency of the evidence under the standards of review established by the Texas Supreme Court in *In re J.F.C.*, 96 S.W.3d 256 (Tex. 2002).  In reviewing the legal sufficiency of the evidence, we must "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true."  *Id*. at 266.  "[A] reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so."  *Id*.  In reviewing the factual sufficiency of the evidence, we "must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing."  *Id*.  "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor

---

[3] The order designates J.M.S. as Child's father, and it terminates his parental rights.  J.M.S. did not appeal, and he is not a party to this appellate proceeding.

of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

## B.   Law on Subsection (O)

Parental rights may be terminated under subsection (O) if the Department establishes by clear and convincing evidence that the parent:

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the [Department] for not less than nine months as a result of the child's removal from the parent under Chapter 262 for abuse or neglect of the child[.]

TEX. FAM. CODE ANN. § 161.001(b)(1)(O).  However, section 161.001(d) precludes termination:

> if a parent proves by a preponderance of the evidence that: (1) the parent was unable to comply with specific provisions of the court order; and (2) the parent made a good faith effort to comply with the order and the failure to comply with the order is not attributable to any fault of the parent.

*Id.* § 161.001(d).

Subsection (O) "authorizes termination for failure to comply with a service plan 'only when that plan requires the parent to perform specific actions.'" *In re R.J.G.*, 681 S.W.3d 370, 378–79 (Tex. 2023) (quoting *In re A.L.R.*, 646 S.W.3d 833, 838 (Tex. 2022) (per curiam)).  Subsection (O) cannot be proven by clear and convincing evidence if based on a plan that is unwritten or one that is written but vague. *Id.* at 373.  Moreover, "it is the violation of 'material' requirements of a plan that justify termination under (O)." *Id.* at 379. Evaluating plan compliance "necessarily requires a nuanced assessment of the parent's conduct and progress toward plan completion in light of the totality of the plan's requirements and overall goal." *Id.* at 381.  Moreover, "termination is not automatic or required, even if the Department properly proves a parent failed to comply with a specific plan provision." *Id.* at 379.  "[T]he trial court bears the ultimate responsibility for determining whether that finding supports termination." *Id.*  Therefore, it is only the violation of

"material" requirements of a plan that justify termination under subsection (O). *Id*. "[I]f the noncompliance is trivial or immaterial in light of the plan's requirements overall, termination under (O) is not appropriate." *Id*.

## C.    Subsection (O) Evidence

The family service plan was admitted into evidence at trial. The service plan order, which largely mirrors the service plan, required Mother to:

> **[Psychological or Psychiatric Evaluation]** – submit to and cooperate fully in the preparation of a court-ordered psychological or psychiatric evaluation. Respondent is hereby notified that any communications made with a counselor, therapist, psychiatrist, or psychologist are not confidential.
>
> **[Counseling]** – attend and cooperate fully in counseling sessions to address the specific issues that led to the removal of the child from the home and to address any additional issues arising from the psychological examinations or from the counseling sessions. Said counseling sessions shall begin upon referral by the Department caseworker, and shall continue until the counselor determines that no further sessions are necessary or until further order of this Court.
>
> **[Parenting Classes]** – attend, participate in and successfully complete parenting classes and shall submit to the Department or file with [the] Court a certificate of completion for parenting.
>
> **[Drug and Alcohol Assessment]** – submit to and cooperate fully in the preparation of the court-ordered drug and alcohol dependency assessment.
>
> **[Drug Testing]** – submit urine samples, saliva samples, or hair follicle samples, as directed by the Department and at times to be determined by the Department, for analysis by a drug testing laboratory. The results of such tests will be reported to the Department and the Court and will be considered in assessing [Mother's] suitability for permanent placement of the child.
>
> **[Visitation] –** Mother shall have . . . [w]eekly supervised visitation, supervised by the [Department].

### 1.    Martinez

Martinez testified that she reviewed the service plan with Mother, and she explained to her each and every service that Mother needed to engage in and complete. Mother indicated to

Martinez that she understood the service plan. The Department filed the service plan in July 2023. Martinez noted that the service plan required that Mother complete a psychological and OSAR assessment, individual counseling, and a parenting class. It also required that Mother submit to random drug testing and to obtain employment and housing.

Martinez testified that, prior to the instant termination proceeding, Mother had been investigated by child protective services in the states of Washington and Virginia. Martinez reviewed the files from these investigations, and she noted that they primarily involved neglectful supervision, physical abuse, emotional abuse, and medical neglect. The files also indicated that, in addition to alcohol, Mother had also abused methamphetamines, benzodiazepine, oxycodone, and hydrocodone as recently as 2021. This documented history of past drug use, in Martinez's estimation, played a part in the Department's concern and need for a full drug assessment and drug testing.

As for drug testing, Mother, according to Martinez, submitted to only one alcohol test, and it was positive. Martinez emphasized that the alcohol test is separate from the drug test. Martinez requested that Mother, on a monthly basis, submit to drug testing between July 2023 and April 2024, but Mother did not go. As for a drug assessment, Martinez testified that while Mother may have completed drug assessments at several mental health facilities, she never provided the Department with a release form to access those records. Martinez reminded Mother of the need to sign release forms during their meetings. Mother entered several inpatient drug treatment programs that involved detox, outpatient counseling, and medication management. However, these programs would inform Martinez that Mother had left the program. Martinez recalled that Mother had not successfully completed any of the drug treatment programs.

Martinez recalled that Mother was treated at Laurel Ridge, Behavior Health Camino Real, a facility in Austin, and a facility in Schertz for suicidal ideations. Martinez knew of these admissions because Mother called her every time she was admitted to a mental health facility. According to Martinez, Mother acted on her suicidal ideations about half of the time by overdosing on pills, cutting her wrists, or overdrinking. Whenever Mother was admitted for inpatient mental healthcare, she told Martinez that she was going to stay and complete treatment, but then she usually left a day or two later. Martinez referred Mother to two providers for a psychological evaluation. Martinez noted that a psychological evaluation is important because it would help determine whether Mother needed medication to help with her mental health stability. Martinez made clear to Mother that these providers had a telehealth option. Martinez admitted that she heard conflicting accounts from other Department employees about whether Mother reached out to the Department-referred providers. Mother told Martinez that she tried calling the Department-referred therapist and did not connect with her and that she would try again. Nevertheless, Mother did not complete a psychological evaluation with them. Similarly, Mother did not complete a psychological evaluation with any other provider.

Martinez believed that Mother has "mentally gotten worse" through the course of the Department's investigation and the termination proceeding. Martinez elaborated that she does not "believe that [Mother's] sentences make sense," that Mother "is a lot more paranoid," and that she has seen "regression." Martinez noted that, during one of their meetings, Mother told her that she "had met some bad people in Austin, who were asking her to sell drugs and to sell herself, and that's why she had to come back to San Antonio." Mother also told Martinez that "she had met El Chapo in Austin, Texas, and that he is after her and [Child] and all of her family, including her

mother, who is in Washington." Martinez was concerned for Mother's mental health during this meeting.

Martinez recalled that Mother and Child had only one in-person visit during her involvement with the case, around October 2023. Martinez observed this visit, and she recalled that Child tried conversing with Mother, but Mother seemed withdrawn and "more upset than happy to see" Child. Mother then brought up Child's caregivers and tried to "escalate the conversation," and Child asked to leave. The visit had been scheduled to be an hour-long, but it ended after approximately five minutes. A second visit had been scheduled for a couple of months later, but Mother missed that visit. The only other "visit" that Martinez could recall was a phone call on Child's birthday that Martinez "supervised." Martinez noted that the phone call did not focus on Child's birthday, but instead Mother put "her emotional stress onto [Child], and [Martinez] did not think that was appropriate." Martinez specified that, during the call, Mother told Child "that she was going through a really hard time and she tried to hurt herself, but she's still trying to get herself together. And she [Mother] was very overwhelming." Martinez noted that she "felt it through the phone call," but that Child was "very patient with her mother and a lot more mature than she should be at 15."

On direct examination by the Department, Martinez relayed that Mother stated she completed parenting courses at Camino Real, but Mother never provided Martinez with verification that she completed that course. Regardless, Martinez opined that the parenting courses Mother claimed to have completed did not satisfy the service plan because they were not intensive enough. According to Martinez, Camino Real's parenting courses lasted only a month, whereas the parenting courses offered by the Department and required by the service plan lasted three

months. However, on cross examination, Martinez acknowledged that the Department had agreed at a prior hearing to deem the parenting course requirement in the service plan as completed.

Martinez concluded her testimony by emphasizing that she believed Mother had not addressed the issues that prompted the Department's investigation and the pending termination proceeding. Specifically, Martinez noted that Mother had not demonstrated any improvement in her mental health and that Mother had not demonstrated an ability to maintain sobriety from alcohol or any other substances.

### 2. Braune

At the time Braune interacted with Mother, she was an employment case manager at American GI Forum National Veterans Outreach Program. Braune helped homeless individuals get employment, recover their identification cards, get housing, and generally "get back on their feet." Braune first met with Mother in person on July 20, 2023, and her last interaction was March or April 2024.

In the first few months, Braune met with Mother weekly, and then in September 2023, the meetings began tapering off. Braune was "not successful" in helping mother find stable housing and employment. Although Mother was employed at La Quinta for about six weeks, she could not keep that job because she had to have a neck biopsy. Other than the job at La Quinta, Braune did not know of Mother holding any other job. Nevertheless, Braune believed that Mother had the capacity to find employment.

Braune explained how she helped Mother find stable housing because, at the time, Mother was living between Haven for Hope, a homeless shelter, another unnamed homeless shelter, and "just on the streets." Braune's program offers transitional housing for veterans, and in March 2024, Braune referred Mother to it. However, Mother did not take the necessary steps to obtain

housing through the program. Braune elaborated that such housing required Mother to be enrolled in the VA healthcare system, but Mother was not enrolled. Mother applied for transitional housing, but she required a first-floor room due to mobility issues from a motor-vehicle accident.

During Braune's last interaction with Mother, Mother became belligerent to the point where the director and coordinator of the program asked her to leave the facility. Mother's belligerent tone concerned Braune, and Braune refused to work with Mother because of it. Braune noted that there were concerns about Mother's mental health issues, and Mother's mental health issues affected her lack of success with the veterans programs offered to her. Braune characterized Mother's lack of success in the programs as not "willful," but the result of her mental health issues.

### D.    Subsection (O) Analysis

In Mother's first issue, she argues that the evidence is legally and factually insufficient to support termination under subsection (O). Specifically, Mother argues that she engaged with multiple service providers but the "Department fail[ed] to verify or acknowledge her compliance" and did not provide transportation assistance or a bus pass. Mother also argues that a lack of transportation, homelessness, and medical issues interfered with full completion.

The trial court may have weighed Mother's contention that the "Department fail[ed] to verify or acknowledge her compliance" by receiving services from multiple service providers against the testimony of Martinez and Braune. Martinez specifically noted that Mother failed to sign release forms so that the Department could access drug assessments that may have been made by the mental health facilities that treated Mother. Although Martinez acknowledged that Mother had begun several drug treatment programs, she noted that these programs informed her that Mother had left the program. Accordingly, the trial court may have reasonably faulted Mother for failing to satisfy the drug assessment requirement in the service plan. As for a psychological

evaluation, the Department referred Mother to two providers who offered telehealth services. The trial court may have reasonably weighed the telehealth option regarding at least the psychological evaluation requirement in the service plan against Mother's criticism that the Department should be faulted for not providing transportation services or a bus pass.

More fundamentally, and assuming Mother completed the parenting class requirement, Mother fails to direct us to any evidence that may have led the trial court to conclude that she completed the drug assessment, random drug testing, psychological evaluation, counseling, and weekly visitation with Child. In light of Mother's history of substance abuse and the concerns for her mental health expressed by Martinez and Braune, the trial court may have reasonably found that the drug assessment, random drug testing, psychological evaluation, and counseling requirements in the service plan were material. *See In re R.J.G.*, 681 S.W.3d 370, 379 (Tex. 2023) (providing that it is only the violation of "material" requirements of a plan that justify termination under subsection (O)). Additionally, Mother raises no concerns regarding the specificity of the requirements in the service plan. *Id*. at 378–79 (providing that subsection (O) "authorizes termination for failure to comply with a service plan 'only when that plan requires the parent to perform specific actions.'").

Lastly, the trial court may have reasonably found that Mother did not make a good faith effort to comply with the service plan. *See* TEX. FAM. CODE ANN. § 161.001(d). Specifically, the trial court may have reasonably found that Mother could have completed a psychological evaluation through telehealth, but she did not. Additionally, after being repeatedly reminded by Martinez, Mother continued to not sign releases so that the Department could access drug assessments that may have been completed at the several inpatient mental health facilities where Mother sought treatment for suicidal ideations. We overrule Mother's first issue.

**E.      Law on Best Interest**

It is the burden of the party seeking termination to establish that termination is in the child's best interest.  *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).  In a best interest analysis, we apply the non-exhaustive *Holley* factors.  *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).[4] The set of factors is not exhaustive, and no single factor is necessarily dispositive of the issue.  *Id*. at 372; *In re A.B.*, 269 S.W.3d 120, 126 (Tex. App.—El Paso 2008, no pet.).

We recognize there is a strong presumption that keeping a child with a parent is in the child's best interest.  *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).  However, promptly and permanently placing a child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a).  Thus, we also consider the factors set forth in section 263.307(b) of the Family Code.  *Id*. § 263.307(b).  Additionally, evidence that proves one or more statutory grounds for termination may be probative of a child's best interest, but it does not relieve the Department of its burden to prove best interest.  *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

In conducting a best interest analysis, we consider direct evidence, circumstantial evidence, subjective factors, and the totality of the evidence.  *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.— San Antonio 2013, pet. denied).  Additionally, a factfinder may measure a parent's future conduct by her past conduct in determining whether termination of parental rights is in the child's best interest. *Id*.  In analyzing the evidence within the *Holley* framework, evidence of each *Holley* factor is not required before a court may find that termination is in a child's best interest.  *In re C.H.*, 89 S.W.3d at 27.

---

[4] These factors include: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the child's best interest; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions.  *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

**F.      Best Interest Evidence**

**1.      Divine**

The trial court recognized that Divine qualified as an expert in professional counseling. Divine testified that she provided Child with five counseling sessions. In Divine's opinion, Child displays signs of anxiety that include becoming physically tense, shifting into a more closed-off posture, and feeling uncomfortable.

Child shared with Divine that she felt unsafe during her visits with Mother because Mother becomes verbally aggressive. Child told Divine that she leaves the visits with Mother feeling very anxious and sad, and that the visits make it difficult for her to focus on school and stay motivated on things that Child feels are important for her to continue moving forward and succeed. Child has expressed that she does not feel safe with Mother because of Mother's verbal aggression toward her and Uncle. Divine noted that around the time of a hearing wherein visitations would be continued, Child's depressive symptoms, including her ability to focus, mood, and self-image got worse. Child expressed feeling safe with her current placement with Uncle and Uncle's sister ("Aunt"). Divine elaborated that Child feels "grateful" for Uncle and Aunt, that she's done better in school, and that the experience of living with them has been "wonderful."

**2.      Uncle**

Uncle acknowledged that in January and February 2023, Mother and Child lived with Uncle because Mother was evicted from her home. In April 2023, Uncle started caring for Child. Uncle recalled that, when he first started caring for Child, a school evaluation noted concern that Child was not performing at grade level. However, Child has since started high school, was placed on a four-year plan, and has exceeded all expectations. Uncle noted that Child's mental health has

improved and that she is now receiving treatment for her previously untreated acne. Uncle is now "licensed" and hoping to adopt Child.

Uncle did not want to enter into a conservatorship arrangement with Mother because she "makes rash decisions." He elaborated that, at the beginning of the Department's investigation, Mother would "call the schools, acting very belligerent, even to the point [where] the schools didn't want to have to deal with her anymore."

Uncle has not observed a mother-daughter bond, and he does not believe that it can be redeemed anytime soon. Uncle has no concerns about being able to meet Child's emotional, physical, and financial needs now or in the future.

### 3. Holmes

Holmes met with Child on a monthly basis since August 2023. Child consistently states that she wants Mother to get well, but that she wants to be adopted by Uncle.

### 4. Martinez

In addition to testifying about the service plan, Martinez touched on the best interest prong, stating:

> We have given her over a year. She's never obtained stable housing or employment. She goes job to job, to different — staying with different people, different places. And I have seen a regression in her mental state. Because she was — I was able to keep a conversation with her in the beginning of — the beginning of the case, and I am no longer able to. And I don't — I think that what she tells me now is concerning. And, also, due to the previous CPS history, I don't think [Child] was ever really safe with [Mother].

Martinez believed that it was in Child's best interest to terminate Mother's parental rights. Child is, according to Martinez, thriving with Uncle and being provided with stability. Child has told Martinez that she wants to stay with Uncle. Martinez elaborated that Child is open to speaking

with Mother, if Mother makes progress on her issues. However, deep down, Child "knows that her [M]other will never change."

## G.    Best Interest Analysis

In Mother's second issue, she argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in the best interest of Child. *See* TEX. FAM. CODE ANN. § 161.001(b)(2).

Regarding the first *Holley* factor, Mother argues "[t]estimony from [Child] indicates that while she has experience[d] conflict with [Mother], [but] she still desires a relationship with her as long as her mother gets the help she needs." Martinez testified:

> Q.    Ms. Martinez, I want to really nail down what [Child] has indicated to you. On the topic of termination, does she want her mother's rights terminated today?
>
> A.    Yes. She does.
>
> Q.    Okay. And now, contact is different from termination; correct?
>
> A.    Correct.
>
> Q.    So, what has she said about possible contact in the future?
>
> A.    She had mentioned that she does not want to speak with her mother, unless her mother has made progress, but that deep down she knows that her mother will never change.

In contrast, Uncle testified that he is willing to adopt Child. Holmes testified:

> Q.    Can you agree with the other testimony today, regarding [Child's] wishes for the outcome of this case?
>
> A.    Yes. [Child] consistently says that she wants her mom to get well, but that she would like to be adopted by [Uncle].
>
> Q.    And is CASA in support of that, so termination of parental rights, to open [Child] up for adoption by [Uncle]?
>
> A.    Yes. I support that. That is [Child's] wishes. Those are [Child's] wishes.

Moreover, Divine testified that Child feels unsafe during her visits with Mother but safe with Uncle. The testimony from Martinez, Holmes, and Divine is evidence supporting the trial court's best interest finding regarding the first *Holley* factor (the child's desires). *In re R.E.C.*, No. 04-24-00478-CV, 2025 WL 325335, at *3 (Tex. App.—San Antonio Jan. 29, 2025, pet. denied) (mem. op.) ("Torres's testimony that R.E.C., who was fifteen years old at the time of trial, wanted to remain with Uncle is evidence supporting the trial court's best interest finding regarding the first *Holley* factor (the child's desires)").

Next, Mother argues that the only evidence regarding the second (the child's present and future emotional and physical needs), third (any present or future emotional and physical danger to the child), fourth (the parental abilities of the individuals seeking custody), seventh (the stability of the home or proposed placement), eighth (the parent's acts or omissions which may indicate that the existing parent-child relationship is improper), and ninth (any excuse for the parent's acts or omissions) *Holley* factors related to "instability rather than imminent harm" and such evidence should be discounted because Mother faced "difficulties" or "significant obstacles" that were "beyond her control."

The testimony from Martinez, Divine, and Uncle, elaborated above, is evidence supporting the trial court's best interest finding regarding the second, third, fourth, seventh, eighth, and ninth *Holley* factors. *See In re C.D.*, 664 S.W.2d 851, 853 (Tex. App.—Fort Worth 1984, no writ) ("While mental incompetence or mental illness alone are not grounds for termination of the parent-child relationship, when a parent's mental state allows him to engage in conduct which endangers the physical or emotional well-being of the child, that conduct has bearing on the advisability of terminating the parent's rights.").

After viewing all of the evidence in the light most favorable to the best-interest finding, we conclude that the trial court could have formed a firm belief or conviction that termination of Mother's parental rights was in Child's best interest. *See In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2003). The first (child's desires), second (the child's present and future emotional and physical needs), third (any present or future emotional and physical danger to the child), fourth (the parental abilities of the individuals seeking custody), seventh (the stability of the home or proposed placement), eighth (the parent's acts or omissions which may indicate that the existing parent-child relationship is improper), and ninth (any excuse for the parent's acts or omissions) *Holley* factors weigh in favor of termination. *See In re J.B.-F.*, No. 04-18-00181-CV, 2018 WL 3551208, at *3 (Tex. App.—San Antonio Jul. 25, 2018, pet. denied) (mem. op.) ("Evidence of a single factor may be sufficient for a factfinder to form a reasonable belief or conviction that termination is in the child's best interest — especially when the evidence shows the parental relationship endangered the child's safety."). We further conclude that any disputed evidence, viewed in light of the entire record, could have been reconciled in favor of the trial court's best-interest finding or was not so significant that the trial court could not reasonably have formed a firm belief or conviction that termination of Mother's parental rights was in Child's best interest. *See In re J.F.C.*, 96 S.W.3d at 266. Therefore, we hold the evidence is legally and factually sufficient to support the trial court's best-interest finding. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). We overrule Mother's second issue.

## H. Conservatorship

In Mother's third issue, she contends that the trial court abused its discretion in making its conservatorship finding upon a legally and factually insufficient termination order. We review the trial court's appointment of a nonparent as sole managing conservator for an abuse of discretion,

and we will reverse that appointment only if we determine it is arbitrary or unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). Having determined the evidence is legally and factually sufficient to support the termination of Mother's parental rights, we further hold the trial court did not abuse its discretion in appointing the Department as the managing conservator of Child. *In re L.G.R.*, 498 S.W.3d 195, 207 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (concluding no abuse of discretion in conservatorship finding where the evidence was sufficient to support termination of parental rights). We overrule Mother's third issue.

### III. CONCLUSION

We affirm the trial court's parental termination order.

Rebeca C. Martinez, Chief Justice